POTTER *v.* RIO ARRIBA L. & C. CO. *et al.*

(*Supreme Court of New Mexico.* January Term, 1888.)

SPECIFIC PERFORMANCE — AGAINST ALIEN — CONTRACT ENTERED INTO PRIOR TO PRO-
HIBITORY ACT.

Act of congress approved March 3, 1887, passed for the purpose of restricting the
ownership of lands in the territories to American citizens, providing for the for-
feiture of lands thereafter acquired by aliens, is not a defense to an action brought
for the specific performance of a contract for the sale of land to an alien corporation
entered into prior to the passage of such act, the corporation not subjecting its lands
to forfeiture by perfecting its equitable title. REEVES, J., dissenting.

Error to the district court, Rio Arriba county.

J. G. Potter filed a petition against the Rio Arriba Land & Cattle Company,
and another to compel the specific performance of a contract. On hearing the
petition was dismissed for want of equity, and plaintiff assigns error.

*Catron, Knaeble & Clancy,* for plaintiff in error.

Specific performance cannot be claimed if the effect would be that the de-
fendant would forfeit the property. *Hepburn* v. *Dunlop,* 1 Wheat. 198; *Orr*
v. *Hodgson,* 4 Wheat. 465. Act of congress approved March 3, 1887, does
not act retrospectively. Courts will never give a law a retrospective opera-
tion unless the legislative intent that the law shall be retroactive clearly ap-
pears. *Chew Heong* v. *U. S.,* 112 U. S. 536, 5 Sup. Ct. Rep. 255; *Twenty
Per Cent. Cases,* 20 Wall. 187; *U. S.* v. *Heth,* 3 Cranch, 399; *Sohn* v. *Wa-
terson,* 17 Wall. 596; *Murray* v. *Gibson,* 15 How. 421; *U. S.* v. *Kirby,* 7
Wall. 482; *Couch* v. *McKee,* 6 Ark. 493. The act of congress merely puts
aliens on a footing with aliens at common law. *Fairfax's Devisee* v. *Hunt-
er's Lessee,* 7 Cranch, 603; *Leazure* v. *Hillegas,* 7 Serg. & R. 319; *Goundie*
v. *Water Co.,* 7 Pa. St. 239; *Bank* v. *Matthews,* 98 U. S. 628; *Trust Co.* v.
*McKinney,* 6 McLean, 5; *Runyan* v. *Lessees of Carter,* 14 Pet. 131; *Gov-
erneur's Heirs* v. *Robertson,* 11 Wheat. 332. Courts of equity have never
shown a disposition to extend the disabilities of alienage, and hence aliens
owning debts secured by mortgages on real estate have been protected, and
corporations have the same rights as natural persons. *Taylor* v. *Carpen-
ter,* 2 Woodb. & M. 14; *Hughes* v. *Edwards,* 9 Wheat. 489, 497; *Neilson* v.
*Lagow,* 12 How. 107; *Taylor* v. *Benham,* 5 How. 233; *Antice* v. *Brown,* 6
Paige, 448; *Marx* v. *McGlynn,* 88 N. Y. 357. In a contract for the sale of
land the vendee is at once, in equity, treated as the owner of the land. 2
Story, Eq. Jur. § 1212; *Craig* v. *Leslie,* 3 Wheat. 577; *Peter* v. *Beverly,* 10
Pet. 532; *Lewis* v. *Hawkins,* 23 Wall. 125; *Boone* v. *Chiles,* 10 Pet. 180; *Hep-
burn* v. *Dunlop,* 1 Wheat. 179. Courts will regard fractions of a day, where
the several acts were done on the same day. *Burgess* v. *Salmon,* 97 U. S.
381; *Louisville* v. *Bank,* 104 U. S. 469. If the alien act is to be construed
so as to prevent the present lawful and safe vesting of estates previously con-
tracted to be conveyed, it must be deemed to operate as a repeal of existing
covenants. 1 Add. Cont. § 327; *Touteng* v. *Hubbard,* 3 Bos. & P. 291; *Od-
lin* v. *Insurance Co.,* 2 Wash. C. C. 312, 321. The same spirit which in-
spired the clause in the constitution prohibiting the states from passing acts
impairing the obligation of contracts should prevail in construing this act.
*Fletcher* v. *Peck,* 6 Cranch, 137; *Thruston* v. *Peay,* 21 Ark. 90; *Parcel* v.
*Barnes,* 25 Ark. 265; *Jacoway* v. *Denton,* Id. 625.

*Henry S. Waldo* and *Geo. W. Knaeble,* for defendants in error.

HENDERSON, J. The plaintiff in error, John Gerald Potter, an alien, hav-
ing been for many years the owner in fee of certain lands in the county of Rio
Arriba, N. M., entered into negotiations for their sale, which were pending
prior to March 3, 1887, which resulted in the formation of an English joint-

stock company called the "Rio Arriba Land & Cattle Company, Limited," and the execution and delivery of a contract dated March 3, 1887, between the said John Gerald Potter of the first part, the said company of the second part, and Valentine Walbran Chapman of the third part, providing for the acquisition by the said company from the said John Gerald Potter of the said lands, as well as of certain personal property and his beneficial interest in a certain leasehold, whereof the legal title was vested in the said Valentine Walbran Chapman, and providing for a relinquishment of said leasehold interest by the said Valentine Walbran Chapman to the said company, and containing the covenant of the said company to pay to the said John Gerald Potter the consideration of £110,000 in its corporate shares of stock, or in cash in the manner set forth in the contract recited at large in the bill of complaint. This contract was duly executed several hours before the alien act became a law by the approval of the president, although on the same day. All the parties, as appears by the pleadings in the case, are satisfied with the bargain and contract as the same stood under the laws in force when the contract was solemnized; but the company alleges that the alien act is an obstacle to the performance of the contract on its part, and although the plaintiff in error has performed, or tendered performance, on his part, and demanded the purchase money or consideration, the company refuses to perform on the pretense that, if it should acquire the legal title to the land in question, it could not hold the property without danger of its forfeiture at the suit or by the act of the United States. The bill is for specific performance of the contract against the other parties. The defendant, Valentine Walbran Chapman, by his answer, disclaims any adverse interest, and submitted himself to the will of the court. The defendant company, by its answer, admitted all the facts set up in the bill, but set up the alien act and its provisions as ground for resisting in equity the assertion of any claim against it for specific performance. The cause was submitted to the district court for the county of Rio Arriba, on the bill and the answers, the only issue being whether the provisions of the alien act would, upon the facts alleged in the pleadings, subject the real estate so contracted to be conveyed to forfeiture in the hands of the defendant company in case it should accept the legal title in performance of the contract. The district court dismissed the bill for want of equity, and to reverse its decree the complainant below sued out the present writ of error. Plaintiff in error assigns the following errors: (1) The district court erred in dismissing the said bill of complaint. (2) The district court erred in its opinion that the complainant below was not entitled to the relief prayed in and by his said bill. (3) The district court erred in its opinion and decision that the act of congress certified in the pleadings restricted and prohibited the performance of the contract in the said bill set forth. (4) The district court erred in refusing to grant the relief prayed in and by the said bill. Defendant admits that the plaintiff in error is entitled to a specific performance of the contract in question, unless the defendant corporation by accepting the legal title would be exposed thereby to forfeiture of the estate thus purchased, by force and effect of the act of congress approved March 3, 1887, entitled "An act to restrict the ownership of real estate in the territories to American citizens," etc. The plaintiff in error, in like manner, admits that upon equitable principles, he cannot demand specific performance if the result would be so disastrous to the corporation. The only question, therefore, presented by this record is the true construction of the alien act as applied to the case made by the pleadings. That act is as follows:

"Be it enacted by the senate and house of representatives of the United States of America, in congress assembled:

"Section 1. That it shall be unlawful for any person or persons, not citizens of the United States, or who have not lawfully declared their intention to become such citizens, or for any corporation not created by or under the laws

of the United States, or of some state or territory of the United States, to hereafter acquire, hold, or own real estate so hereafter acquired, or any interest therein, in any of the territories of the United States, or in the District of Columbia, except such as may be acquired by inheritance, or in good faith, in the ordinary course of justice in the collection of debts heretofore created: provided, that the prohibition of this section shall not apply to cases in which the right to hold or dispose of lands in the United States is secured by existing treaties to the citizens or subjects of foreign countries, which rights, so far as they may exist by force of any such treaty, shall continue to exist so long as such treaties are in force, and no longer.

"Sec. 2. That no corporation or association, more than twenty per centum of the stock of which is or may be owned by any person or persons, corporation or corporations, association or associations, not citizens of the United States, shall hereafter acquire or hold or own any real estate hereafter acquired in any of the territories of the United States, or of the District of Columbia.

"Sec. 3. That no corporation other than those organized for the construction or operation of railways, canals, or turnpikes, shall acquire, hold, or own more than 5,000 acres of land in any of the territories of the United States; and no railroad, canal, or turnpike corporation shall hereafter acquire, hold, or own lands in any territory other than as may be necessary for the proper operation of its railroad, canal, or turnpike, except such lands as may have been granted to it by act of congress. But the prohibition of this section shall not affect the title to any lands now lawfully held by any such corporation.

"Sec. 4. That all property acquired, held, or owned in violation of the provisions of this act shall be forfeited to the United States, and it shall be the duty of the attorney general to enforce every such forfeiture by bill in equity, or other proper process. And, in any suit or proceeding that may be commenced to enforce the provisions of this act, it shall be the duty of the court to determine the very right of the matter without regard to matters of form, joinder of parties, multifariousness, or other matters not affecting the substantial rights either of the United States, or of the parties concerned in any such proceeding, arising out of the matters in this act mentioned."

The defendant corporation is an alien company, and within the prohibitions contained in the act of congress, and complainant, Potter, and defendant Chapman are alien subjects of Great Britain. It is conceded on both sides that the defendant corporation is not within any of the expressed provisos or exceptions contained in the statute. The naked question, therefore, for our consideration is, does the act of congress above recited, when construed with reference to the true intent and purpose of that body in its enactment, apply to executory contracts under which equitable titles are acquired in good faith, prior to the passage of the act, in such manner as to prevent the parties from converting equitable into legal estates, and to deny to the courts the right to compel the performance of contract obligations by specific performance? It is not denied that congress has power to impair even vested rights, where the purpose and intention clearly expressed is to that effect. Whatever, therefore, that intention was, if clearly expressed, must be carried out. By the first section of the act it is declared to be unlawful for any person or persons, not citizens of the United States, or who have not lawfully declared their intention to become such citizens, or for any corporation not created by or under the laws of the United States, or of some state or territory of the United States, to hereafter acquire, hold, or own real estate so hereafter acquired, or any interest therein, in any of the territories of the United States, or in the District of Columbia, except such as may be acquired by inheritance, or in good faith in the ordinary course of justice in the collection of debts heretofore created, provided that the prohibition of this section shall not apply to cases in which the right to hold or dispose of lands in the Union is secured by existing

treaties. The second section denies to corporations the right to hold or hereafter acquire any real estate within the territories or the District of Columbia where more than 20 per centum of the stock of such corporation shall be owned by aliens. The third section limits purchases by corporations other than such as are organized for the operation or construction of railways, canals, and turnpikes, to 5,000 acres, except grants heretofore made to such corporations by congress; but the prohibition of the section does not affect the title to any land lawfully held by any such corporation at the date of the passage of the act. The fourth section declares that all property acquired, held, or owned in violation of the provisions of the act shall be forfeited to the United States, and it shall be the duty of the attorney general to enforce every such forfeiture by bill in equity, or other proper process. It is conceded by counsel for defendant in error that, under the laws of congress and this territory, at the date of the execution of the contract an alien had a right to acquire, hold, and own real estate in New Mexico. It is further admitted that the contract between the parties was duly made and executed prior to the approval of the alien act by the president. Defendant does not resist a specific performance of the contract except upon the ground of an apprehended forfeiture should it accept a title. The contract was executed several hours before the president approved the act, and in a case like this fractions of a day will be considered. *In re Richardson,* 2 Story, 571; *Burgess* v. *Salmon,* 97 U. S. 381; *Louisville* v. *Bank,* 104 U. S. 469.

It is our duty to examine the act in question, and ascertain therefrom the objects and purposes had in view by congress in its enactment, and to give it effect as intended, regardless of consequences, provided such intention is clearly manifested by the language employed, or follows as a necessary implication from the language and the purposes intended to be accomplished by the act. The real intention of the law-making power must govern in the interpretation of an act. The duty of a court is performed by exploring an act of legislation, and gathering from all of its provisions the real purpose in the mind of the enacting body, and, if within its power to pass, to carry out such purpose. Keeping this well-understood principle of interpretation in mind, let us inquire into the real object and purpose of this alien act. Its purpose, as expressed in the title, was and is to restrict the ownership of lands in the territories of the United States to American citizens. The principal motive inducing the enactment was the prevention of citizens and subjects of other countries from hereafter acquiring real estate in the territories. It was the policy of the act to preserve the land within its control for the use of American citizens. To accomplish this purpose an inhibition was placed upon alien acquisition in the future, and in order to insure the enforcement of this policy, the attorney general was commanded to institute legal proceedings, by bill in equity or other process, to enforce a forfeiture of such estates conveyed in violation of its terms. It is declared to be unlawful for aliens "to hereafter acquire, hold, or own real estate so hereafter acquired." There is nothing in the act that even suggests the idea that congress intended to destroy, or even impair, either legal or equitable titles acquired prior to the passage of the act. The act does not in express terms apply to existing titles to lands, nor is there any reason deducible from the terms employed to justify the conclusion that congress intended to impair or render valueless executory contracts under which equitable estates had matured or vested. This much is in effect admitted by counsel for defendant in error, but they contend that it was the clearly expressed purpose of the law-making power to arrest and suspend the execution of further titles, or the acquisition of further interests in lands, in the territories. To convert an equitable estate into a legal one is, in fact, to acquire an additional or different quality of estate, it is true, but it has none of the elements of an entirely new estate. The language used to designate the estates upon which the forfeiture would take effect shows that the estate

must be acquired after the passage of the act. If A. holds an equitable estate in possession, and has paid the purchase price, neither the vendor nor the United States can disturb his possession, or impeach his title. His right to the possession came from a valid and lawful contract of purchase, and his payment of the purchase money discharged all his covenants with the grantor. The grantor could never recall the possession. The United States could not insist upon a forfeiture, and yet, if the intention of congress was to cut off alien rights, or prevent executory contracts of purchase, valid when made, from ripening into legal estates, by the operation of the statutes of limitation, some remedy should have been provided by which a forfeiture could have been enforced. Can we fairly and reasonably conclude that congress meant to say that one may enjoy forever his estate if it be legal in quality, but an equitable one, although protected so long as it remains purely of that class? Yet the identical estate, the instant it is merged in a legal title, comes within the mischief of the statute, and under the condemnation of the law? This would be, as we think, against the spirit and reason of the act itself, without invoking the aid of equitable fictions to protect the legal estate from forfeiture. The act forbids future purchases. To "acquire" means to gain something, and that something, within the true intent and meaning of the act of congress, is a new estate or interest in lands, not the addition of a legal, to an already existing equitable, title. It could not aid the policy of the act, or further the interests of American citizens, by refusing the right to make perfect and absolute in form a title protected against interference or invasion from either the vendor or the government. The estate would continue in the hands of the alien whether he held under the legal or equitable title. By doing what is demanded by the bill in this case the court would only execute a valid and perfectly lawful contract by its decree. It would not violate the policy of the law, because that policy is to take effect and operate only on future purchases or holdings. Congress clearly intended to guard and protect existing contract rights.

In *Chew Heong* v. *U. S.*, 112 U. S. 559, 5 Sup. Ct. Rep. 255, in construing an act of congress prescribing the certificate which shall be produced by Chinese laborers as the only evidence permitting them to establish a right of reentry into the United States, it was held that its provisions in this respect were not applicable to a certain class of Chinese laborers, although the statutory phraseology was literally sufficient to apply to that class, as well as others. The class in question was held under the protection of a prior treaty, and, notwithstanding the conceded powers of congress to enact laws in contravention of a treaty, the court refused to imply such an intent, and in effect disregarded the literal wording of the statute, under the presumption—*First*, that the treaty provision was not designed to be abrogated; and, *second*, that retrospective legislation was not intended. The court said: "We have stated the main reasons which, in our opinion, forbid that interpretation of the act of congress. To these may be added the further one that the courts uniformly refuse to give to statutes retrospective operation whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature. In *U. S.* v. *Heth*, 3 Cranch, 398, 413, this court said that ' words in a statute ought not to have a retrospective operation, unless they are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied, and is the settled doctrine of this court.' *Murray* v. *Gibson*, 15 How. 421, 423; *McEwen* v. *Den*, 24 How. 242, 244; *Harvey* v. *Tyler*, 2 Wall. 328, 347; *Sohn* v. *Waterson*, 17 Wall. 596, 599; *Twenty Per Cent. Cases*, 20 Wall. 179, 187." In adopting the language of the court in *Chew Heong* v. *U. S.*, *supra*, in construing that act, we say of this, so far from the court being compelled by the language of the act of congress to give it a retrospective operation, the

plain, natural, and obvious meaning of the words, interpreted with reference to the general scope and the declared purpose of the statute, utterly forbids the conclusion that there was any intention to impair or destroy rights previously granted. In *Twenty Per Cent. Cases,* 20 Wall. 187, Mr. Justice CLIFFORD, in delivering the opinion of the court, said: "Courts of justice agree that no statute, however positive in its terms, is to be construed as designed to interfere with existing contracts, rights of actions, or with vested rights, unless the intention that it shall so operate is expressly declared, or is to be necessarily implied, and pursuant to that rule courts will apply this statute only to future cases, unless there is something in the nature of the case or in the language of the new provision which shows that they were to have a retroactive operation. Even though words of a statute are broad enough in their literal extent to comprehend existing cases, they must yet be construed as applicable only to cases that may hereafter arise, unless the language employed expresses a contrary intention in unequivocal terms." Citing *Potter,* 1 Dwar. St. 161; *Wood* v. *Oakley,* 11 Paige, 403; *Butler* v. *Palmer,* 1 Hill, 325; *Jarvis* v. *Jarvis,* 3 Edw. Ch. 466; *McEwen* v. *Den,* 24 How. 242; *Harvey* v. *Tyler,* 2 Wall. 329; *Blanchard* v. *Sprague,* 3 Sum. 535; *U. S.* v. *Heth,* 3 Cranch, 399. On the 3d day of March, 1887, when the alien act became a law, the statute of this territory gave the unrestricted right to acquire real estate to aliens. See Comp. Laws, §§ 1851, 2614, 2746, 2748. Also *Cowell* v. *Springs Co.,* 100 U. S. 55; *Christian Union* v. *Yount,* 101 U. S. 352. On principle we see no reason for imputing to congress a greater degree of reluctance to impair rights derived under a treaty than for imputing to that body a like reason in favor of rights vested under contract or upon the faith of a prior statute. The principle of interpretation announced by the supreme court, as seen by the cases cited, has been adopted by state courts almost universally. In *Couch* v. *McKee,* 6 Ark. 493, Judge OLDHAM said: "The great injustice of retrospective legislation has been frequently exposed by courts of justice, and their disapprobation of such laws has been expressed in the strongest language. We think it cannot be denied that the contract for the conveyance of the lands described in the bill was an existing contract, and conferred upon complainant a right of action in the courts, when the alien act became a law, and applying the language of the supreme court of the United States in the *Twenty Per Cent. Cases, supra:* "Courts of justice agree that no statute, however positive in its terms, is to be construed as designed to interfere with such existing contract, rights of actions, or with vested rights, unless the intention that it shall so co-operate is expressly declared or is necessarily implied, and pursuant to that rule will apply new statutes only to future cases, unless there is something in the nature of the case or in the language of the new provision which shows that they were intended to have a retroactive operation. And even though the words of the statute are broad enough in their literal extent to comprehend existing cases, they must be construed as applicable only to cases which may hereafter arise, unless the language employed expresses a contrary intention in unequivocal terms." There is nothing in the alien act nor in the nature of the case before us to show that the act was intended to have a retroactive operation, so as to cut off or in any way impair the right of complainant to have his equitable estate perfected into a legal one. This new statute was expressly designed to apply to future cases only and to alleged rights springing out of contracts of purchase made subsequent to the date of passage of the alien act. Should the alien act be construed so as to prevent the present lawful and safe vesting of estates previously contracted to be conveyed, it must be deemed to operate as a repeal of existing covenants. 1 Add. Cont. § 227; *Touteng* v. *Hubbard,* 3 Bos. & P. 291; *Odlin* v. *Insurance Co.,* 2 Wash. C. C. 312, 321; and in this view of the case the covenant must be deemed annulled by operation of law. As we have seen, no such intention can be gathered from the lan-

guage employed in the act.    The facts in this case do not call for nor demand
the application of the doctrine obtaining in equity in some cases to the effect
that where a contract has been entered into for the purchase of real estate
equity will convert the real estate into personalty for the purpose of avoid-
ing either an escheat or forfeiture.    As we think no forfeiture will be in-
curred by the acceptance of the deed by the grantee it is not necessary to in-
vent a fiction or adopt a subtle line of reasoning to save the estate in the
hands of the grantee.

We think the court below erred in dismissing complainant's bill.    The de-
cree of the court below will be reversed and a decree entered here awarding
specific performance as prayed in and by complainant's bill, and it is so or-
dered.

LONG, C. J., and BRINKER, J., concurred.

REEVES, J., (*dissenting.*)    The complainant, John Gerald Potter, a subject
of Victoria, Queen of Great Britain and Ireland, etc., and a resident of the
county of Middlesex, England, brings his bill of complaint against the Rio
Arriba Land & Cattle Company, Limited, a corporation created and organized
under the laws of the united kingdom of Great Britain and Ireland, having,
as the bill alleges, a designated agent and place of business in the county of
Rio Arriba and territory of New Mexico, and against Valentine Walbran
Chapman, a resident of the county of Middlesex, England, defendants.    The
complainant avers ownership in certain lands in Rio Arriba county and ter-
ritory of New Mexico, known as the "Rio Arriba Ranches," embracing about
270,000 acres of land, part of the San Joaquin del Rio de Chama grant; also
a leasehold estate in or of said grant for grazing and pastural purposes for 10
years, and claiming under said Valentine Walbran Chapman as his lessor.
The complainant alleges the formation of a corporation bearing the name of
the Rio Arriba Land & Cattle Company, Limited, on March 3, 1887, for the
purpose, among other things, to acquire by purchase or lease the land and
premises known as the "Rio Arriba Ranches," and to carry on the business of
cattle breeding, and generally to deal in cattle and live-stock, and for other
purposes; that after the incorporation of the Rio Arriba Land & Cattle Com-
pany, and on the 3d day of March, 1887, the complainant, John Gerald Pot-
ter, and the defendant the Rio Arriba Land & Cattle Company entered into a
contract in writing for the sale and purchase of the said Rio Arriba ranches
and of said leasehold estate and the live-stock, horses, farming implements,
etc., on said ranches, to be paid for by the company, in the shares of the com-
pany, or the equivalent in cash, on the execution and delivery of deeds of con-
veyance, of the premises, etc., by the complainant, Potter, to the company on
the terms specified in the contract.    The complainant alleges his offer to com-
ply with the contract on his part upon payment to him of the purchase money
according to the contract.    The complainant further alleges that the defend-
ant company is ready and willing to perform the contract on its part if the
complainant can make it a good and marketable title to said land and prem-
ises, but that the defendant company alleges that complainant is not able to
make such title because of the act of congress of the United States, ap-
proved March 3, 1887, entitled "An act to restrict the ownership of real estate
in the territories to American citizens, and so forth," and that the defendant
company, as it alleges, is rendered incompetent to acquire the legal title to
the said lands and premises, and the same would be in its hands, if it should
perform the contract subject to forfeiture at the suit of the United States;
whereas the complainant charges that he can make a good title to said prop-
erty.    The complainant further alleges that the defendant Chapman has no
longer any interest in said land and premises nor leasehold estate, but that
by the terms of the contract it is his duty to make and deliver to the Rio Ar-

riba Land & Cattle Company such further releases and assurances as may be required in behalf of the company; prays that the defendant company and said Chapman may be compelled by the decree of the court specifically to perform the contract with complainant.   The bill of complaint was filed with the clerk November 1, 1887.   On the same day the defendant Chapman and the defendant company, by their respective solicitors, entered their appearance, and made separate answers to the bill of complaint.   Chapman disclaimed any interest in the property, and, admitting the complainant's allegations to be true, he answered that he was willing to execute any further assurance of title to the leasehold premises to the defendant company as the court may direct.   The defendant company, by its answer, fully admits the complainant's allegations, and states its willingness to perform the contract on its part if the complainant can make a good and marketable title to said land and premises, but charges that the complainant is not able to make such title for the reasons stated in the bill of complaint, and declines, without the direction and command of the court, to perform on its part the contract.   The parties, complainant and defendants, by their respective solicitors, stipulate in writing for the hearing of the cause upon the bill of complaint and the answers of the defendants.   The question in this case is:   Can the court grant the prayer of the complainant for a decree directing or compelling the defendants specifically to perform their contract with the complainant on the allegations of the bill and the answers in the cause.   The complainant contends that an equitable estate was vested in the defendant company by its contract with the complainant on March 3, 1887, and that the company is not precluded by the act of congress of March 3, 1887, restricting the ownership of real estate in the territories to American citizens, from converting their equitable estate into a legal estate. A court of equity is as much bound by the common or statute law commanding or prohibiting a thing to be done as a court of law.   The maxim that equity follows the law means that equity adopts the analogies furnished by the rules of law.   The maxim that equity regards that as done which ought to have been done finds its application in cases of the equitable conversion of property, and where the act is not illegal, as where money is directed to be invested in lands in which case the money is treated as real estate in equity; or where land is contracted to be sold, it is treated in some cases as money.   But this has no application to the case before the court.   There is no authority to compel specific performance of the agreement while the act of congress is in force. *Baylies* v. *Fettyplace*, 7 Mass. 325, 337; *Harrington* v. *Dennie*, 13 Mass. 93, 94; *Church* v. *Mayor*, etc., 5 Cow. 538; 2 Pars. Cont. 184–186, 564, 576.   The general rule authorizing a decree for the specific performance of a contract is that the matter in controversy has some special value not capable of being compensated in damages, or it is the breach of a contract for which the law affords no adequate relief.   The complainant alleges that the contract between himself and the defendant company was executed, and that the company was incorporated on the same day, (March 3d,) that the president approved said act of congress, but before its approval.   It is not clear, from the allegations of the bill, whether the want of notice of the act of congress refers to the time when the contract was executed, and when the defendant was incorporated, or refers to the time while the negotiation between the parties was going on. The defendant company, in its answer, after admitting that the act of congress was not approved by the president until after the expiration of five hours subsequent to the making of the contract, alleges that arrangements for the incorporation of the defendant, in view of said contract, had been the subject of negotiation between the parties before any information had reached England or had come to the parties of the bill which resulted in said act of congress.   If the want of notice was available for any purpose, it should have been averred that the contract was executed before the defendant, as well as the complainant, had notice of the act of congress.   But it is not applicable

to this case, according to the well-known maxim that ignorance of law is not an excuse, and this applies as well in equity as in law. The covenants of the contract are mutual. The complainant offers to perform the contract on his part upon payment of the purchase money, and the defendant company is willing to perform the contract on its part if the complainant can make the company a good marketable title to the premises. Where there is equal equity, the court will not interpose on either side, but will leave the parties *in statu quo*. The act of congress so often referred to is entitled "An act to restrict the ownership of real estate in the territories to American citizens, and so forth." Approved March 3, 1887. By the first section of this act, and the one applicable to this case, it is provided that it shall be unlawful for any person or persons not citizens of the United States, or who have not lawfully declared their intention to become such citizens, or for any corporation not created by or under the laws of the United States, or of some state or territory of the United States, to hereafter acquire, hold, or own real estate so hereafter acquired, or any interest therein, in any of the territories of the United States or in the District of Columbia, except such as may be acquired by inheritance or in good faith, in the ordinary course of justice in the collection of debts heretofore created: provided, that the prohibition of this section shall not apply to cases in which the right to hold or dispose of lands in the United States is secured by existing treaties to the citizens or subjects of foreign countries, which rights, so far as they may exist by force of any such treaty, shall continue to exist so long as such treaties are in force, and no longer." St. 2d Sess. 49th Cong. 1886–87, p. 476.

The parties to the suit, complainant and defendants and corporation, come within the class of persons and corporations prohibited by the act from acquiring real estate in the territories, unless they are within the exceptions of the act. The complainant, John Gerald Potter, and the defendant Valentine Walbran Chapman are aliens and residents of the county of Middlesex, England, and the defendant the Rio Arriba Land & Cattle Company is an alien corporation, created and organized under the laws of the united kingdom of Great Britain and Ireland. Evidently they do not come within the exceptions allowing aliens and alien corporations to acquire real estate by inheritance or in good faith, in the ordinary course of justice, in the collection of debts created before the passage of the act, nor within the class of cases in which the right to hold or dispose of lands in the United States is secured by existing treaties to the citizens or subjects of foreign countries so long as the treaties are in force. By the second section of the act no corporation having more than 20 per centum of its stock owned by alien persons or alien corporations "shall hereafter acquire or hold or own any real estate hereafter acquired in any of the territories of the United States or of the District of Columbia." By section third of this act "No corporation, except for the construction or operation of railroads, canals, or turnpikes, shall hereafter acquire, hold, or own more than five thousand acres of land in any of the territories of the United States." To decree a conveyance of the real estate, thereby converting an equitable estate into a legal one, by virtue of the agreement between the parties for a title, would make an exception not made by the act of congress, and violate the provisions prohibiting alien corporations from acquiring real estate in the territories of the United States. The exceptions mentioned in the act of congress must be held to exclude all exceptions not expressed or necessarily implied. Corporations and natural persons acquire and hold property under different tenures. Corporations derive their powers to acquire and hold property from charters and acts of incorporation under legislative authority. For some purposes not necessary to be considered in this case, corporations are deemed persons. When the alien act became a law, the Rio Arriba ranches were not lawfully acquired or held by said company and corporation, and not excepted out of said act as real estate acquired be-

fore the passage of the act. A territorial legislature may create corporations, and prescribe the terms upon which they may do business or acquire property in the territory, subject to the control of congress. *Williams* v. *Bank,* 7 Wend. 539; *Riddick* v. *Amelin,* 1 Mo. 5; *University* v. *State,* 14 How. 268. The agreement between the complainant, Potter, and the defendant corporation was not made under the sanction of the laws of the territory of New Mexico, but in disregard of its laws. Section 218, Comp. Laws N. M., provides that "every company incorporated under the laws of any foreign state or kingdom, or of any state or territory of the United States beyond the limits of this territory, and now or hereafter doing business in this territory, shall file in the office of the secretary of this territory and in the office of the recorder of deeds of the county in which the principal place of business of such corporation shall be, a copy of its charter of incorporation; or in case such company is incorporated under any general incorporation law, a copy of its articles of incorporation, and of such general incorporation law, all duly certified by the proper authority of such foreign state, kingdom, or territory. Such company shall also, before it is authorized or permitted to do business in this territory, make and file with the secretary of the territory and in the office of the recorder of deeds of the county in which its principal place of business shall be, a certificate, signed by the president and secretary of such company, duly acknowledged, designating the principal place where the business of such company shall be carried on in this territory, and an authorized agent or agents residing at such principal place of business, upon whom process may be served, and such corporations shall have the same powers, and shall be subject to all the liabilities and duties as corporations of a like character organized under the general laws of this territory. But they shall have no other or greater powers, and no foreign or domestic corporation established or maintained in any way for pecuniary profit of its stockholders or members shall purchase or hold real estate in this territory except as provided for in this act and the laws of the territory now existing. * * *" It is not averred in the bill of complaint or otherwise shown that the copies and certificates mentioned in the above section of the statute have been filed with the secretary of the territory and clerk of the proper county as prerequisites before the company was authorized or permitted to do business in the territory. This statute, in express terms, provides that foreign corporations shall have the same powers and be subject to all the liabilities and duties of corporations of a like character organized under the general laws of the territory; but that they shall have no other or greater powers, and that no foreign or domestic corporation established or maintained in any way for the pecuniary profit of its stockholders or members shall purchase or hold real estate in this territory except as provided in this act and the laws of the territory now existing. But what are the purposes for which corporations may be organized under the laws of this territory, and what are their powers, liabilities, and duties? Section 192, Compiled Laws of the territory, specifies the different purposes for which corporations may be organized in the territory, some of them for pecuniary profit of the stockholders and members of the company, others for benevolent, charitable, and scientific purposes, and still others of a different kind. By the following section (section 193) provision is made for the organization of domestic corporations, requiring the parties to make, sign, acknowledge, and record, in the proper office, a statement in writing setting forth the full names of the persons; the corporate name of the company; the objects for which the company shall be formed; the amount of its capital stock; the time of its existence, not to exceed 50 years; the number of shares of which the stock shall consist; the number of directors and their names; the name of the city or town and county in which the principal place of business of the company is to be located. Section 195 of the statute defines the powers conferred on domestic corporations, and among other powers to have succession for the

period limited with power "to purchase, hold, sell, mortgage, and convey such real and personal estate as the purposes of the corporation shall require." There is no mistaking the purposes of the Rio Arriba Land & Cattle Company as being a corporation for the pecuniary profit of its stockholders or members, as shown by the bill of complaint. The court can have no legal evidence of the corporate character of the defendant company nor of its powers, duties, and liabilities, without having the copies of the certificates, charters, and statutes certified by the secretary of the territory, or the originals as required by section 220, Comp. Laws N. M. The agreement between the parties recites that the complainant, Potter, shall sell, and the company shall purchase, the Rio Arriba ranches, estimated to contain about 270,000 acres of land, and the buildings thereon, and live-stock, horses, etc., and followed by an averment in the bill of complaint that the company had purchased a herd of cattle and placed the same on the land and premises known as the "Rio Arriba Ranches," for corporate enjoyment and purposes. Was not the purchase of the land and cattle a positive violation of the laws of the territory, inhibiting foreign corporations from doing business in the territory, and from acquiring or holding property in the territory without having first complied with the statutes? Will the court decree specific performance of the agreement, thereby compelling the defendant corporation to accept a deed of conveyance, when such decree and deed will violate the laws of the territory? The statute authorizing bodies politic to convey their real estate must be construed in connection with the statute authorizing corporations to acquire and hold real estate. Comp. Laws N. M. §§ 218, 2748. To say that the statute authorizing aliens to acquire, hold, and sell real estate in the territory includes alien corporations, without any restriction on their powers, would be to lose sight of all distinctions between natural persons and corporations. Comp. Laws N. M. §§ 218, 2746. Their charters and acts of incorporation must define their powers, and not the general provisions of statutes relating to real estate and conveyances. Under the general rules for the construction of statutes, all on the same subject are construed together, and no one statute is to be rejected for the purpose of supporting another. Comp. Laws N. M. §§ 218, 1851, 2614.

Evidently the purpose of the parties was that the defendant corporation should acquire property and do business in the territory of New Mexico by virtue of its foreign charter or act of incorporation, without regarding the laws of the territory. They stipulate that the agreement shall be filed with the registrar of joint-stock companies, pursuant to the company's act, 1867, alleging in the bill that the agreement had been so filed. The complainant, Potter, agrees to give such covenants and conveyances as shall be in compliance with the conveyancing and law of property act 1881. The purchase was to be completed, the money paid, and deeds executed in the city of London. The transcript contains an agreement between the parties that the cause and all matters in controversy therein should be heard and finally determined upon the bill of complaint, and answers filed in the cause as hereinbefore stated, and a further agreement to omit from the printed record the exhibit referred to in the pleadings, the tenor and purport of the same being set forth in the pleadings according to the agreement. The duties and liabilities of the corporation, and the legal evidence of its existence, are not matters of privilege that litigants may dispense with and waive by agreement. It is not giving the statute a retrospective operation to refuse a decree for specific performance of an executory contract. Specific performance cannot be claimed as a vested right or right of any kind, but depends on the circumstances of each particular case. 2 Story, Eq. Jur. § 742. The statutes of this territory make no discrimination between foreign and domestic corporations as respects the right to acquire, hold, and dispose of their property. These statutes have been in force more than 20 years. No objection can be made as to the treatment of alien or foreign corporations that will not apply to domestic corpora-

tions.  The legislation of the territory has always been liberal towards foreign corporations and foreign and alien persons in conferring the right to acquire, enjoy, and dispose of their property in the territory.  In the case of the *Singer Manuf'g Co.* v. *Hardin*, 16 Pac. Rep. 605,[1] decided at the present term of the court, section 218 of the Compiled Laws of the territory was upheld in most if not all of its provisions.  In that case the court refers to and quotes from the case of *Paul* v. *Virginia*, 8 Wall. 168, as follows: "It affirms the right of a state or territory to name the conditions upon which a foreign corporation may enter the state and there exercise the corporate franchise and receive the recognition and protection of the local sovereignty," where the conditions do not constitute a transaction of commerce within the meaning of the constitution.  This is further explained in the case of *Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 5 Sup. Ct. Rep. 826.  In that case the court said: "As to those subjects of commerce which are local or limited in their nature or sphere of operation, the state may prescribe regulations until congress assumes control of them."  Clearly the regulations prescribed by the territorial statutes relate to subjects which are local and limited to the territory, and not inconsistent with the commercial clause of the constitution.

I find no authority to change by a decree of the court the *status* of the property as it existed at the time the alien became a law by vesting a different title in the defendant company, an alien corporation, and thereby conferring a right to acquire and hold real estate in this territory by a different tenure contrary to the act of congress and the laws of the territory.  On these grounds I think the complainant's bill ought to be dismissed.