## LOUISVILLE *v.* SAVINGS BANK.

1. When necessary to determine conflicting rights, courts of justice will take cognizance of the fractions of a day.

2. The section of the Constitution of Illinois, entitled "Municipal subscriptions to railroads or private corporations" (*infra*, p. 471), which took effect July 2, 1870, did not invalidate township bonds, which, pursuant to a vote cast at an election of the voters of the township lawfully held on that day, before closing the polls of the general election, were issued to pay a previously voted donation, that was to be raised by special tax.

3. *Harter* v. *Kernochan* (103 U. S. 562) cited and approved.

ERROR to the Circuit Court of the United States for the Southern District of Illinois.

This was an action brought by the Portsmouth Savings Bank against the township of Louisville, Clay County, Illinois, upon coupons detached from bonds issued Jan. 5, 1871, by the supervisor and town clerk to the Springfield and Illinois Southeastern Railway Company, which was formed in February, 1870, by the consolidation of the Illinois Southeastern Railway Company with the Pana, Springfield, and Northwestern Railroad Company. The bonds, fifteen in number, bear date April 1, 1870, and each recites that it " is one of a series of bonds issued by said township to aid in the construction of the Illinois Southeastern Railway, in pursuance of the authority conferred by an act of the General Assembly of the State of Illinois, entitled ' An Act to incorporate the Illinois Southeastern Railway Company,' approved Feb. 25, 1867, and an act amendatory thereof, approved Feb. 24, 1869, and an election of the legal voters of the aforesaid township, held on the tenth day of November, 1868, under the provisions of said act."

The inhabitants, legal voters of the township, pursuant to notice, duly and lawfully issued, met July 2, 1870, at 9 A. M., for the purpose of deciding by vote " whether a special tax be levied for the payment of the sum of $15,000, donated by said town to the Illinois Southeastern Railway Company, or that bonds be issued for the payment of said donation."

Fifty-two votes were cast for bonds and two for a special tax.

The supervisor filed, Jan. 9, 1871, the requisite sworn certificate of that date with the State auditor, who thereupon registered in his office the bonds, each being for $1,000. The bonds were delivered to the company after the first coupon had been cut from each and destroyed. The plaintiff was a *bona fide* holder for value of them without notice of anything impairing their validity other than what appears upon the face of them, or in the Constitution and laws of Illinois. The remaining facts are stated in the opinion of the court. Judgment was rendered for the plaintiff, and the township sued out this writ of error.

*Mr. W. J. Henry* for the plaintiff in error.
*Mr. Shelby M. Cullom* for the defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

The bonds in question contain the same recitals as those of Harter Township in the same county, the validity of which was determined in *Harter* v. *Kernochan*, 103 U. S. 562. The same questions which arose on the validity, construction, and scope of the enactments under which they were issued, and delivered to the consolidated company, are now presented for determination. We perceive no reason for withdrawing or qualifying the conclusions we then announced.

There is, however, one question of some importance which did not then arise. It appeared in that case that the election held under the act of Feb. 25, 1867, on Nov. 10, 1868, — at which the township voted a donation to be raised by special tax, payable in three equal annual instalments, — was supplemented by another, held, under the authority of the amendatory act, on the twentieth day of May, 1870, at which Harter Township directed bonds to be issued in payment of its donation previously voted. In the present case, while the election at which the township of Louisville voted a similar donation, to be raised by like special tax, was also held on the 10th of November, 1868, the one at which the township voted to issue bonds in payment of such donation was not held until the 2d of July, 1870. On the day last named the people of Illinois voted in favor of the adoption of a new constitution. The second of the additional sections, which is

entitled " Municipal subscriptions to railroads or private corporations," was separately submitted, and is in these words : " No county, city, town, township, or other municipality shall ever become a subscriber to the capital stock of any railroad or private corporation, or make donation to or loan its credit in aid of any such corporation : *Provided, however,* that the adoption of this article shall not be construed as affecting the right of any such municipality to make such subscriptions where the same have been authorized, under existing laws, by a vote of the people of such municipalities prior to such adoption." In *Town of Concord* v. *Portsmouth Savings Bank* (92 U. S. 625), we held that donations by counties or other municipalities in Illinois to railroad companies could not lawfully be made after July 2, 1870, though authorized by a statute enacted and a popular vote cast before the adoption of the Constitution. This ruling was made in ignorance of the fact, to which our attention was not at the time called, that the Supreme Court of Illinois had, in an unreported case, decided that the intention of the framers of the Constitution was not to prohibit donations authorized under pre-existing laws by a vote of the people prior to the adoption of that instrument, but to place subscriptions and donations on the same footing. Consequently, in *Fairfield* v. *County of Gallatin* (100 U. S. 47), the ruling was modified, and the construction placed upon the organic law of Illinois by its highest court accepted and enforced. It may, therefore, be regarded as the settled law of Illinois that its Constitution recognized as binding donations, as well as subscriptions, by a township in aid of a railroad corporation, which were authorized, under existing laws, by a vote of the people prior to the adoption of that instrument.

We have seen that the people of Louisville Township did, prior to the adoption of the Constitution of 1870, vote in aid of this railroad enterprise a donation to be raised by special tax, for a limited period. That donation was, beyond question, unaffected by the constitutional provision prohibiting municipal aid to railroads or private corporations. When that instrument was adopted the township had ample authority, conferred by the vote of the people, to raise by special tax a specific amount to be donated for the purpose indicated.

But the argument, on behalf of the plaintiff in error, pro-
ceeds upon these grounds : that this is not a suit to enforce the
levy of a special tax in payment of the donation voted Nov. 10,
1868, but a suit on the bonds voted on the second day of July,
1870; that by the settled course of decisions in the Supreme
Court of Illinois the township officers could not legally issue
*bonds* in payment of a donation, previously voted to be raised
by special tax, without the consent of the people expressed at
an election duly called and held for the purpose of determin-
ing that question; that no election could confer authority to
issue bonds unless held before the section of the Constitution
which we have mentioned took effect; that the section having
been adopted by popular vote on the 2d of July, 1870, was in
operation from the first moment of that day; and that, con-
sequently, the township election held on the same day was,
in view of the constitutional inhibition, unavailing to confer
authority to substitute a donation of interest-bearing bonds
maturing many years after date, for a donation to be satisfied
by a special annual tax for three years.   In other words, that
a popular vote authorizing an issue of bonds, in order to escape
that inhibition, must have been cast prior to the *day* on which
the Constitution was adopted.

Passing by, as unnecessary for determination, the prop-
ositions embodied in the first branch of this argument, and
conceding them for the purposes of this case to be correct, we
proceed to inquire as to the time when the Constitution of
1870, including that section, became the fundamental law of
the State, and what effect it had on the township election held
on the 2d of July of that year.

At what precise hour on that day the Constitution was
adopted by popular vote cannot be stated.   But we know that
it could not have occurred before sunset, since the schedule,
providing for the submission of the Constitution to the popular
vote, expressly required the polls to be kept open for the
reception of ballots until that hour.   Nor are we able to ascer-
tain, from the record, the exact moment when the township
voted in favor of the issue of these bonds.   The town meeting
to determine whether they should be issued, in lieu of a special
tax, was to be held at nine o'clock in the forenoon; it was so

held, and only fifty-four votes were cast, of which fifty-two were in favor of the issue. The presumption may, therefore, be fairly indulged that the township had, in fact, voted for issuing bonds before the close of the general election, on the same day at which the people of the State voted on the adoption of the particular sections of the Constitution, separately submitted, which relates to municipal subscriptions to railroads and private corporations.

The schedule provided that if a majority of the votes polled were for the Constitution, so much of it as was not separately submitted should be the supreme law of the State on and after Aug. 8, 1870. The Supreme Court of Illinois, in *Schall* v. *Bowman* (62 Ill. 321), declared that although the result of the election could not have been officially ascertained and declared before the expiration of some weeks thereafter, the provision relating to municipal aid to railroad corporations " was so framed that it could, appropriately and effectually, become a part of the organic law, without the disturbance of any of its elements, and was a declaration of the people *on* the second day of July, 1870, that *from* and *after that day*, no matter what may become of the new Constitution, no county, city, town, township, or other municipality shall ever become subscriber to the capital stock of any railroad or private corporation, or make donations to, or loan its credit in aid of, such corporation." Further, in the same case it was said : " We are unable to find anything in the Constitution itself, or in the schedule thereto, militating against the view we have taken, that this separate article of the Constitution of 1870 went into full effect on the day of its adoption by a vote of the people ; that is, on the second day of July, 1870. There is no provision of the Constitution requiring a different construction." The subscription, the validity of which was there involved, we remark, in passing, was made in pursuance of a municipal election held on the third day of August, 1870.

The next case was *Richards* v. *Donagho*, 66 id. 73. It related to a proposed municipal subscription in pursuance of an election called July 12, 1870, and held Aug. 2, 1870. The court adhered to the decision in *Schall* v. *Bowman*. The remaining case to which our attention has been called is *Wright* v. *Bishop*,

88 id. 302. There the vote for an issue of bonds was given at an election held on the second day of August, 1870. The court, referring to the preceding cases, said: " This, we have held, was too late. The clause in the Constitution, containing the prohibition against municipal subscriptions or donations in aid of railroad companies and other private corporations, took effect on the second day of July, 1870; and all such subscriptions or donations, not authorized by a vote of the municipality, prior to that time, are void."

It is thus seen that the cases related to an election held in the month of August, 1870. Neither of them involved the validity of a subscription or a donation made in pursuance of an election held on the 2d of July, 1870; and, consequently, that learned tribunal has not indicated its opinion as to whether the constitutional inhibition forbade a municipal subscription or donation, in pursuance of an election held on the very day of the adoption of the Constitution. It is true that the court, in *Wright* v. *Bishop*, after saying that the provisions in question " took effect on the 2d of July, 1870," remarked that " all such subscriptions or donations, not authorized by a vote of the municipality, prior to that time, are void." But that language must be interpreted with reference to the facts of the particular case presented for judicial determination. It is not clear that the phrase, " prior to that time," was intended to refer to the day on which the constitutional provision took effect, as distinguished from the precise moment of its adoption by the popular vote. The case involved no such question.

We are justified in so interpreting the decision in *Wright* v. *Bishop* by what was said in *Grosvenor* v. *Magill* (37 id. 239), the doctrines of which have not, so far as we are able to find, been modified by any subsequent ruling of that court. The question involved was whether the law regards fractions of a day. The court, speaking by Mr. Justice Lawrence, said : " It is true that for many purposes the law knows no division of a day; but whenever it becomes important to the ends of justice, or in order to decide upon conflicting interests, the law will look into fractions of a day, as readily as into the fractions of any other unit of time. 2 Bl. Com. 140, notes. The rule is purely

one of convenience, which must give way whenever the rights of parties require it. There is no indivisible unity about a day which forbids us, in legal proceedings, to consider its component hours, any more than about a month, which restrains us from regarding its constituent days. The law is not made of such unreasonable and arbitrary rules."

The views expressed in the last case are consistent with sound reason and public policy. They accord with our own judgment, and are in line with the settled course of decisions in other courts.

In *Arnold* v. *United States* (9 Cranch, 104), it was declared to be the general rule that where computation is to be made from an act done, the day on which the act is to be done should be included. Hence, an act of Congress, imposing additional duties to be levied and collected upon all goods imported from and after its passage, was adjudged to be in force on the day of its approval by the President. And, upon the principle that the law will not take cognizance of fractions of a day, it has been said in some cases that a statute is operative from the first moment of the day on which it takes effect. But to these general rules there are established exceptions, as an examination of adjudged cases and elementary treatises will show.

Mr. Justice Story has discussed this question with fulness in *In the Matter of Joseph Richardson*, 2 Story, 571. By an act approved March 3, 1843, the statute establishing a uniform system of bankruptcy throughout the United States, approved Aug. 19, 1841, was repealed. But it contained a proviso that the act should not affect any cause or proceeding in bankruptcy *commenced before its passage*, or any pains, penalties, or forfeitures incurred under said act; but that " every such proceeding might be continued to its final consummation," in like manner as if that act had not passed. A petition in bankruptcy was filed by Richardson on the 3d. of March, 1843, and the question arose whether it was cut off by the repealing act approved on the same day.

It appeared that the petition was filed about noon, while the repealing act was not, in fact, approved by the President until late in the evening of the same day, several hours after the

filing of the petition. It was ruled, upon the case presented, that the act of Congress should be held to have taken effect only from the act of approval by the President, and not by relation from the commencement of the day on which such approval was given. After a review of the English decisions, the court said : " So that we see that there is no ground of authority, and, certainly, there is no reason to assert that any such general rule prevails, as that the law does not allow of fractions of a day. On the contrary, common sense and common justice equally sustain the propriety of allowing fractions of a day, whenever it will promote the purposes of substantial justice."

In *Lapeyre* v. *United States* (17 Wall. 191), it was said that an act of Congress, unless it is otherwise declared by law, becomes operative from the first moment of the day of its passage ; and, further, that " fractions of the day are not recognized," and " an inquiry involving that subject is inadmissible." In reference to that case we remark, that the question presented for determination was not as to fractions of a day, but whether a proclamation of the President, bearing date June 24, 1865, took effect on that day or on the 27th of June, 1865, when it was first promulgated by publication in the newspapers. That case did not require a determination of the question of law now before us. The language quoted from the opinion must, therefore, be taken as a declaration of the general rule which obtains when the evidence does not show the necessity of regarding fractions of a day.

In *United States* v. *Norton* (97 U. S. 164), the court, while declaring, upon the authority of *Lapeyre* v. *United States*, that the President's proclamation of June 13, 1865, removing all restrictions upon internal, domestic, and coastwise intercourse and trade, took effect as of the beginning of June 13, 1865, and covered all the transactions of that day to which it was applicable, said : " We do not think this is a case in which fractions of a day should be taken into account." This language of the Chief Justice clearly implies that there were cases in which the court would regard fractions of a day. Besides, there was no question in that case, nor any proof made, as to the particular hour of the day when the proclamation of the President was issued.

At the same term *Burgess* v. *Salmon* (id. 381) was decided. An act of Congress increased the tax on tobacco from twenty to twenty-four cents per pound, but contained a proviso that the increased tax should not apply to tobacco " on which the tax under existing laws shall have been paid when this [that] act takes effect." It was approved on the afternoon of March 3, 1875, while the tobacco of Salmon was stamped, sold, and removed for consumption or use from the place of manufacture in the forenoon of the same day. It was ruled that the court could inquire as to the time of the day when the President approved the act, and that " the time of such approval points out the earliest possible moment at which it could become a law, or, in the words of the act of March 3, 1875, at which it could take effect." It was, consequently, adjudged that the tobacco was not subject to the increased tax imposed by a statute which was not in fact approved, and did not take effect, until after the removal, on the same day, of the tobacco. In that case the parties agreed as to the respective hours of the day when the tobacco was, in fact, stamped and removed, and when the act was approved by the President. But such an agreement could not have authorized an inquiry into fractions of a day, unless such inquiry were permissible by the established rules of law.

The cases in the State courts bearing upon this question, and taking substantially the same view, are numerous. We refer to only two of them. In *Kennedy* v. *Palmer* (6 Gray (Mass.), 316), the question was as to the jurisdiction of a justice of the peace of a particular county to hear and determine an action, commenced May 7, 1865, on which day the governor of the State approved an act, by which the exclusive jurisdiction of all such actions, " not already pending," was vested in a police court thereby established, the act providing that it should take effect from and after its passage. The evidence did not show either the hour of the day when the action was commenced, nor the hour when the governor approved the act. The court adjudged that the justice had jurisdiction until the precise point of time when the act was approved, and thus became a law ; and that since it did not appear that the suit was instituted after the approval of the act, it must be treated

as one pending at the passage of the act, and, therefore, as unaffected by its provisions.

The other case is *People* v. *Clark*, 1 Cal. 406. The facts of that case were these: Clark was elected county judge at an election regularly appointed and held. On that day the legislature passed an act repealing the one by virtue of which the election was held, and conferring upon the governor the power of appointment. The repealing act was approved the same day, but at what hour of the day did not appear. Some days thereafter the relator was, by the governor, appointed county judge. The court sustained the validity of the election, remarking that " the time of the approval of the executive is a fact which can be ascertained and proven, and in all cases, where the rights of parties are in any manner to be affected by the time of the approval, an investigation of the question, when the event — the passage of the act — occurred, should be had."

There are decisions in the English courts to the same effect. In *Roe d. Wrangham* v. *Hersey* (3 Wils. 274), the court characterized, as a mere fiction of law, the general proposition that there were no fractions of a day ; that, " by fiction of law, the whole time of the assizes and the whole session of Parliament may be, and sometimes are, considered as one day ; yet the matter of fact shall overturn the fiction in order to do justice between the parties." *Fictio cedit veritati; fictio juris non est ubi veritas.* In *Combe* v. *Pitt* (3 Burr. 1423, 1434), Lord Mansfield expressed similar views. He said: " But though the law does not, in general, allow of the fraction of a day, yet it admits it in cases where it is necessary to distinguish. And I do not see why the very hour of the day may not be so too, when it is necessary and can be done ; for it is not like a mathematical point, which cannot be divided."

In view of the authorities it cannot be doubted that the courts may, when substantial justice requires it, ascertain the precise hour when a statute took effect by the approval of the executive. But it may be argued that the rule does not apply where the inquiry is as to the time when constitutional provisions became operative by popular vote ; that a popular vote, given at an election covering many hours of the same day, should be deemed one indivisible act, effectual, by rela-

tion, from the moment the electors entered upon the perform-
ance of that act, to wit, from the opening of the polls. But
we are of opinion that no such distinction can be maintained.
In determining when a statute took effect no account is taken
of the time it received the sanction of the two branches of the
legislative department, which sanction is as essential to the
validity of the statute as the approval of the executive. We
look to the final act of approval by the executive to find when
the statute took effect, and, when necessary, inquire as to the
hour of the day when that approval was, in fact, given. So,
in ascertaining when a constitutional provision was adopted,
we perceive no sound reason why the courts may not, in proper
cases, inquire as to the hour when such approval became ef-
fectual, to wit, as to the time when, by the closing of the polls,
the people had adopted such provision. In this case all dif-
ficulty is removed by the fact, made certain by the schedule
to the Constitution requiring the polls to be kept open until a
certain hour of the day of election. That fact should not be
disregarded or ignored in ascertaining when the constitutional
provision was adopted, especially since it expressly saved the
obligations and rights of the municipalities which had, before
its adoption, under the authority of pre-existing laws, voted
subscriptions or donations.

We are of opinion that, within the fair meaning of the State
Constitution, the township election of the 2d of July, 1870,
was held prior to the adoption of the section forbidding munici-
pal subscriptions or donations in aid of railroad corporations,
and under the authority of valid enactments in force when
such election was held. The bonds, the coupons of which
are in suit, were, consequently, unaffected by the prohibitions
of the State Constitution. All other material objections to
their validity have been considered and overruled in *Harter* v.
*Kernochan.*

*Judgment affirmed.*