**LEHIGH VALLEY R. CO. v. STATE OF RUSSIA.**

Circuit Court of Appeals, Second Circuit.
August 8, 1927.

Nos. 318, 319.

**1. International law ⬚9—Right to damages for loss of explosives bought by Russian government held to become property of state of Russia when loss occurred.**

The right to recover damages for the breach of a carrier's obligation to properly transport .and care for high explosives bought by the ·Russian government and in transit to Russia *held* to become property of the state of Russia at the time the loss ·occurred.

**2. International law ⬚10—Foreign government may sue in federal courts.**

The right of a foreign government to sue in federal courts is well settled.

**·3. Constitutional law ⬚68(1)—Foreign relations are matters for executive and legislative departments, and are not subject to judicial inquiry or decision.**

The conduct of foreign relations is committed to the executive and legislative departments of the government, and the propriety of what is done by these departments is not subject to judicial inquiry or decision.

**4. Constitutional law ⬚68(1)—Who may be sovereign de jure or de facto of territory is not judicial question.**

Who may be the sovereign de jure or de facto of a territory is a political question, and not one to be determined by the courts.

**5. International law ⬚3—A "government" is political agency through which the "state" acts in international relations.**

The "state" is a community or assemblage of people, and the "government" is the political

agency through which it acts in international relations.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Government; State.]

**6. International law ⬚8—Foreign state is true owner of its property, and its government is its representative.**

A foreign state is the true or real owner of its property, and its government is the agency which represents the national sovereignty.

**7. Ambassadors and consuls ⬚8—Financial attaché of Russian embassy under provisional Russian government, recognized by State Department as custodian of property of Russian government, held authorized to continue suits begun by provisional Government.**

Financial attaché of the Russian embassy under the provisional Russian government, who was recognized by the State Department as custodian of the property of the Russian government, *held* authorized to continue suits for the state of Russia, which had been begun by the provisional Government.

**8. Evidence ⬚26—Court must judicially recognize that state of Russia survives, notwithstanding changes in government.**

Court must judicially recognize that the state of Russia survives, notwithstanding there have been changes in its form of government.

**9. Ambassadors and consuls ⬚8—Diplomatic agents of one state may maintain actions in another for their state, while they are recognized as its representatives.**

Diplomatic agents of one state, while in another which recognizes them as the representatives of their state, may commence and maintain actions on behalf of their state, *so long* as they are so recognized.

**10. Ambassadors and consuls ⬚1—Proof that alleged diplomatic agent represents certain foreign state depends on recognition by political department of United States government,**

Proof of the agency of the alleged representative of a foreign state is dependent entirely on the political fact of recognition by the political department of the United States government.

**11. Constitutional law ⬚68(1)—Court has no power, independently of political department, to determine who should be considered proper diplomatic representative of foreign state.**

A court has no power, independently of the executive and legislative departments of the government, to determine who should be considered as the proper diplomatic representative of a foreign state, and may not make its own investigation.

**12. International law ⬚10—Where representative of provisional Russian government, suing in name of state of Russia, was recognized by political department, that Russian Socialist Federated Republic might actually control held not to affect action.**

In an action brought by the provisional Russian Government, and later continued by a representative of that government in the name of the state of Russia, where the representative was recognized by the political department,

the fact that there might have been a Russian Socialist Federated Republic actually in charge of the government of Russia *held* not to affect the action.

**13. International law ⊙�415 10—Judiciary will recognize government of foreign state last recognized by political department, notwithstanding withdrawal of ambassador.**

Unless the political department of the government has decided otherwise, the judiciary recognizes the condition of things with respect to another country, which was last recognized by the political department, and so will recognize the last recognized government, notwithstanding the withdrawal of the ambassador.

**14. International law ⊙�415 9—Refusal to recognize new government of foreign state does not mean that foreign state loses recognition as international person.**

The granting or refusal of recognition of the new government of a foreign state has nothing to do with the recognition of the foreign state itself as an international person.

**15. International law ⊙�415 10—Suit begun by provisional Russian Government did not abate by change in form of Russian Government.**

Suit begun by provisional Russian Government and later continued in the name of the state of Russia, did not abate because of the change in the Russian form of government.

**16. International law ⊙�415 9—Foreign "state" survives its form of government.**

A foreign "state" is perpetual, and survives its form of government.

**17. International law ⊙�415 10—Recognized government of Russia may carry on suit until new government is recognized.**

In an action to recover for loss of explosives, begun by the provisional Russian Government and continued in the name of the state of Russia, *held*, that the recognized Russian government might carry on the suit until the new government became accredited by recognition.

**18. International law ⊙�415 9—Acts by or affecting new government of Russia, performed outside of Russia, cannot be validated by recognition of new government.**

It is only acts performed within its territory that can be validated by retroactive effect of recognizing new Russian government. and acts performed outside its own territory cannot be validated by recognition.

**19. International law ⊙�415 9—Defendant paying judgment to recognized agent of state of Russia will be protected against claims of possible subsequently recognized government.**

Where the provisional Russian Government began action against defendant carrier to recover for loss of explosives, and the suit was continued in the name of the state of Russia, *held*, that defendant, paying judgment to recognized agent of the state of Russia, would be protected against possible future claims of any subsequently recognized new government of Russia.

**20. Carriers ⊙�415 108—Carrier's common-law liability as insurer, when carrying explosives, held not changed by federal laws (Federal Explosives Law, Criminal Code, §§ 233, 235 [18 USCA §§ 383, 385]; Carmack Amendment to Interstate Commerce Act [49 USCA § 20]; Commerce Act [49 USCA § 1 et seq.]).**

The Interstate Commerce Commission regulations for the transportation of explosives (Federal Explosives Law, Criminal Code, §§ 233, 235 [18 USCA §§ 383, 385]), and the Carmack Amendment to Interstate Commerce Act (49 USCA § 20 [Comp. St. § 8604a]), do not change the common-law liability of a carrier as insurer, when carrying explosives, whether or not there has been a breach of some federal law or Interstate Commerce Commission regulation adopted under authority conferred by Commerce Act (49 USCA § 1 et seq. [Comp. St. § 8563 et seq.]).

**21. Carriers ⊙�415 136—Evidence of carrier's negligence in not preventing loss of explosives held to justify directed verdict for plaintiff, especially since carrier violated Interstate Commerce Commission regulations (Interstate Commerce Commission Regulations, §§ 1650, 1906).**

In an action against a carrier for loss of explosives while in its possession in freight yards, evidence of negligence in not having locomotives to. move cars in case of fire *held* to justify directed verdict for plaintiff, especially since the carrier violated Interstate Commerce Commission Regulations, §§ 1650, 1906.

**22. Pleading ⊙�415 248(10)—Amendment striking out allegations of negligence in action against carrier for loss of explosives held not to change cause of action, since under facts alleged carrier had common-law liability, without regard to negligence.**

In an action against a carrier for loss of explosives by fire while in the carrier's freight yards, amendment striking out allegations of negligence *held* properly permitted, since it did not change the cause of action, because, under the facts set forth, the carrier had a common-law liability, without regard to negligence.

**23. Pleading ⊙�415 248(1)—Amendment introducing no different cause of action or state of facts as basis for action is properly granted.**

An amendment which introduces no new or different cause of action, or sets up no different state of facts as the ground for the action, is properly granted, and presents no error.

**24. Carriers ⊙�415 134—In action against carrier for loss of goods, proof of ownership, delivery to carrier, and failure to deliver to consignee held sufficient to obtain recovery without proof of negligence.**

In action against carrier for loss of explosives by fire while in the carrier's freight yards, it was sufficient, in order to recover damages, without proving negligence, to prove ownership, delivery to the carrier in good condition, and failure to deliver to consignee.

**25. Carriers ⊙�415 153—Phrase "Shipper's load and count, * * * owner's risk," stamped on bill of lading, held not to relieve railroad of carrier's liability (49 USCA § 20).**

Phrase, "Shipper's load and count, charges guaranteed, owner's risk," stamped on a bill of

lading *held* not to amount to a special contract whereby the railroad was relieved of carrier's liability, in view of Act March 4, 1915 (49 USCA § 20 [Comp. St. § 8604a]).

**26. Carriers ⬅154—Mere agreement to transport goods furnishes no consideration for stipulation for less than common-law liability (49 USCA § 20).**

A mere agreement to transport goods furnishes no consideration for a stipulation that the railway shall be liable for less than its common-law liability, especially in view of Act March 4, 1915 (49 USCA § 20 [Comp. St. § 8604a]).

**27. Carriers ⬅110—Carrier held, as matter of law, to have notice of explosive nature of shipment.**

Where bills of lading described shipment as high explosives, and placards showing contents of cars to be explosives were affixed to cars, the railroad had notice, as a matter of law, of the explosive nature of the shipment, within bill of lading provision requiring full disclosure of explosive qualities of goods shipped.

**28. Time ⬅10(10)—Saturday afternoon, held "holiday," within bill of lading provision giving consignee 48 hours after notice to take delivery.**

Saturday afternoon *held* a "holiday" for business purposes, within the meaning of a bill of lading provision which gave the consignee 48 hours after notice to take delivery.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Holiday.]

**29. Time ⬅10(10)—Bill of lading provision, giving consignee "48 hours" after notice to take delivery, held to mean 2 full working days.**

Bill of lading provision, giving consignee of explosives "48 hours" after notice to take delivery, *held* to mean 2 full working days, and hence not to include Saturday afternoon.

**30. Carriers ⬅125½—Where consignee filed damage claim according to directions of carrier, carrier held estopped to assert claim was not filed according to bill of lading requirements.**

Where carrier reported loss to consignee and advised him to file claim in a place different from that where the bill of lading recited that such claim should be filed, the carrier was thereafter estopped, after the consignee had filed his claim according to the carrier's directions, to assert that the claim was not filed as required by the bill of lading.

**31. Carriers ⬅134—Evidence held to justify ruling that lighterage company was independent contractor, and not consignee's agent, in transporting explosives to defendant railway's terminal.**

In action against carrier for damages caused by fire and explosion, where defendant claimed that lighterage company, carrying explosives to defendant railway's terminal, was consignee's agent, so that consignee was responsible for its negligence, evidence *held* to justify ruling that the lighterage company was an independent contractor, for whose possible negligence plaintiff was not responsible.

**32. Carriers ⬅121—Consignee held not liable for possible negligence or illegal operation of lighterage company, transporting consignee's explosives to defendant carrier's terminal as independent contractor.**

In action against carrier for loss by fire and explosion, consignee *held* not liable for the possible negligence or illegal operation without a permit of lighterage company, which was transporting consignee's explosives to defendant carrier's terminal as an independent contractor.

**33. Carriers ⬅136—Where consignee has no duty to watch explosives in carrier's care, fact that detectives hired by consignee failed to prevent explosion cannot raise contributory negligence issue.**

In an action against a carrier for loss by fire and explosion, where the consignee had no duty to watch its explosives while in the carrier's possession, fact that detectives, whom carrier claimed had been hired by the consignee, were negligent in failing to discover the fire and in putting it out, cannot raise the issue of the consignee's contributory negligence.

**34. Carriers ⬅132—Burden held on carrier to prove loss of explosives was due to some cause relieving it from carrier's liability.**

In an action against a carrier for loss of explosives by fire and explosion, the burden was on the carrier to prove that the damage arose solely from some cause excepted from the general rule making the carrier liable as an insurer.

**35. Carriers ⬅123—Possible negligence of consignee of explosives will not relieve carrier of liability, if loss would not have occurred, except for carrier's concurring fault.**

Possible negligence of consignee of explosives in not preventing their loss by fire and explosion will not relieve the carrier from its liability, if the loss would not have occurred, except for the carrier's concurring fault.

**36. Stipulations ⬅14(5)—Under stipulation that findings in No. 2 action should be considered findings of No. 1, possible errors in findings on negligence held immaterial as to No. 1, where negligence was not issue.**

Where the parties stipulated that findings in No. 2 action should be considered findings in No. 1 action, which raised no negligence issue, possible errors in findings on negligence or instructions or rulings on that issue in No. 2 held immaterial, in so far as action No. 1 was concerned.

**37. Carriers ⬅137—Where only negligence alleged in counterclaim was that of independent contractor, for which plaintiff was not liable, instructing jury to find against counterclaim held proper.**

In an action against a carrier, wherein the carrier counterclaimed, alleging negligence, and the only negligence alleged was that of an independent contractor, for which the plaintiff was not liable, instructing the jury to find for plaintiff on the counterclaim was proper.

**38. Carriers. ⬦⟶135—Interest is allowable in imposing damages on carrier from time property should have been delivered.**

Interest is allowable from the time property should have been delivered in imposing damages on a carrier for breach of its common-law obligation.

In Error to the District Court of the United States for the Southern District of New York.

Action No. 1 by the State of Russia against the Lehigh Valley Railroad Company for breach of contract of carriage. Judgment for plaintiff. Defendant brings error. Affirmed.

Hornblower, Miller & Garrison, of New York City (Charles A. Boston, of New York City, George S. Hobart, of Newark, N. J., and Nash Rockwood, of New York City, Edgar H. Boles, and Richard W. Barrett, of counsel), for plaintiff in error.

Coudert Bros., of New York City (Frederick R. Coudert and Hartwell Cabell, both of New York City, Mahlon B. Doing, and B. F. Sturgis, of counsel), for the State of Russia.

Charles Recht and Osmond K. Fraenkel, amici curiæ.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge. The defendant in error has recovered a judgment against the plaintiff in error for loss of explosives and ammunition while in transit from the United States to Russia and while in its possession as carrier in its freight yards at Jersey City, N. J. The loss is due to a fire and explosion occurring July 30, 1916, and it is admitted that the fire was incendiary in its origin. The action by the defendant in error was instituted by the Russian government, and after the deposition of the then government of Russia, pursuant to an order granted, the action was continued in the name of the state of Russia.

Eight carloads of high explosives were on the same railroad siding, and, separated by a single car, on the same siding were seven cars of benzol and wet nitrocellulose; on an adjoining track were seven cars of ammunition of cannon. In the same vicinity were eight other cars of ammunition of cannon, two cars of combination fuses, and another car of benzol. A fire started in a car of ammunition prior to the first explosion, which occurred on a barge in the North River, which barge was also loaded with explosives, and then another explosion occurred in a car in the terminal.

The barge was owned and operated by the Johnson Lighterage Company. After the fire started, no one, because of fear of the result that might follow from the explosive materials, attempted to put out the fire. Neither the railroad men, private detectives, nor the city firemen attempted to apply water or otherwise combat the fire, with one exception, a crew of the railroad men, who succeeded in removing some cars to a place of safety. Some lost their lives in this act. The railroad company failed to maintain a locomotive at the Black Tom Terminal, and the engine used in removing these cars was brought 2½ miles from Communipaw yards. At the time there was in force regulation No. 1906, which provided that in case of fire, to protect cars marked by placards "Inflammable," they should be quickly isolated. But in any case the explosions occurred before the engines arrived. Liability was imposed below because of the breach of the railroad's obligation as a common carrier, as supplemented by the Carmack Amendment (Comp. St. § 8604a [49 USCA § 20]), under the terms of the bills of lading issued.

There is a companion case (C. C. A.) 21 F.(2d) 406, referred to as action No. 2, but which is based upon the theory of negligence, which was tried at the same time. The trial of this action was suspended, and action No. 2 was begun and concluded before the same judge, but a different jury. It involved the destruction of war materials, aluminum, and other property in a nearby warehouse. The parties in writing stipulated that the specific findings, answering two questions propounded to the jury in action No. 2, might be used as facts in action No. 1. The jury found that the fire originated in the railroad terminal and the first explosion occurred on the barge Johnson No. 17. It also found, in action No. 2, that the railroad company's sole negligence was the proximate cause of the loss of the aluminum in the warehouse.

[1-6] At the outset the railroad company attacks the right of the defendant in error to maintain the suit, and to do so in the courts of the United States. The right to recover damages for breach of this carrier's obligation became the property of the state of Russia on July 30, 1916, when the loss occurred. The government was then the Russian Imperial Government. The right of a foreign government to sue is now well-recognized. Oetjen v. Central Leather Co., 246 U. S. 297, 38 S. Ct. 309, 62 L. Ed. 726; The Sapphire, 78 U. S. (11 Wall.) 164, 20 L. Ed. 127. It is equally a settled rule of law that the foreign

relations of our government are committed by the Constitution to the executive and legislative departments of our government, and what is done by such departments is not subject to judicial inquiry or decision. In re Cooper, 143 U. S. 472, 12 S. Ct. 453, 36 L. Ed. 232; Williams v. Suffolk Ins. Co., 13 Pet. 420, 10 L. Ed. 226; United States v. Palmer, 3 Wheat. 610, 4 L. Ed. 471; The Penza (D. C.) 277 F. 91. Who may be the sovereign de jure or de facto of a territory is a political question; not judicial. Oetjen v. Central Leather Co., supra; Jones v. United States, 137 U. S. 212, 11 S. Ct. 80, 34 L. Ed. 691. The state is a community or assemblage of men, and the government the political agency through which it acts in international relations. State of Texas v. White, 7 Wall. 700, 19 L. Ed. 227; Cherokee Nation v. Georgia, 5 Pet. 52, 8 L. Ed. 25; Foulke, International Law, vol. 1, pp. 62, 82, 102, 192. The foreign state is the true or real owner of its property, and the agency the representative of the national sovereignty. The Sapphire, supra; The Rogdai (D. C.) 278 F. 294.

On July 5, 1917, Mr. Boris Bakhemeteff was recognized by our State Department as the accredited representative of the Russian government—the provisional Russian Government—as successor to the Imperial Russian Government. He continued as such until July 30, 1922. At that date he retired, and the custody of the property of the Russian government, for which Bakhemeteff was responsible, was recognized by the State Department to vest in Mr. Ughet, the financial attaché of the Russian embassy. The Soviet government, which later secured control of the Russian government, was never recognized by our State Department, and ever since the diplomatic status with our government was never altered by the termination of the ambassador's duties. Therefore the provisional Russian Government is the last that has been recognized, and after its ambassador retired its property was considered by the State Department to vest in its financial attaché. Prior to his retirement, and while the accredited ambassador, Mr. Bakhemeteff authorized the suits here considered, which were commenced July 23, 1918.

[7, 8] Various preliminary attacks by motions to dismiss the complaint have been made, and the District Court has in each instance properly denied them, recognizing the principles of law referred to and their application to the fact that there has been no change recognized in the government or agency for Russia by the political branches of our government. Mr. Ughet, by the State Department's determination, is entitled to the custody in the United States of the property of Russia, and as part of that duty he was authorized to continue the suits for the state of Russia. This duty became obvious. It became important to avoid efforts to destroy the right of action as a basis of keeping its property, when motions to dismiss were made and delays occurred which would give rise to the bar of limitation to sue. The question of Mr. Ughet's power under his agency is generally important, because of the change in name of the plaintiff in the action to the state of Russia in substitution of the Imperial Russian Government. We must judicially recognize that the state of Russia survives.

[9-12] Abatement of the action or a dismissal could only be sustained by reason of the nonexistence of the state, or the action of our government to no longer recognize the agency once accredited and never revoked. The action was properly started by an unquestioned agency. The attorneys and the agency thus employed were obliged to continue until some other government was recognized. It has been recognized that diplomatic agents of one state, while in another, may commence and maintain actions on behalf of their state while they are recognized as such. Republic of Mexico v. De Arangoiz, 12 N. Y. Super. Ct. 643. Proof of the agency or of the diplomat is dependent entirely upon the political fact of the recognition by the political department of the government. The courts may not independently make inquiry as to who should or should not be recognized. The argument of the plaintiff in error is directed entirely toward the court making its own investigation, in expectation that there would be some other government found, either de facto or de jure. This we may not do. Kennett v. Chambers, 14 How. 38, 14 L. Ed. 316; Agency of Canadian Car Co. v. American Can Co. (C. C. A.) 258 F. 363, 6 A. L. R. 1182; Russian Socialist Federated Republic v. Cibrario, 235 N. Y. 255, 139 N. E. 259. If it be a fact that there is a Russian Socialist Federated Republic now in charge of the government of Russia, it would bring no different result here.

[13] Where there is a change of government, foreign states must of necessity judge for themselves whether they will continue their accustomed diplomatic relations with the prince whom they choose to regard as the legitimate sovereign. Wheaton on International Law, p. 332. It matters little whether

the recognized state co-operates in it or not. Moore's Digest of International Law, vol. 1, p. 73. It is for the executive and legislative departments to say in what relations any other country stands toward it. Courts of justice cannot make the decision. Agency of Canadian Car Co. v. American Can Co., supra; Moore's International Law, vol. 1, p. 63. Nor does the personal withdrawal of an ambassador affect the relations with the government. Hyde, International Law, vol. 1, p. 731; Moore's Digest of International Law, vol. 4, p. 437. And, unless the political department of our government has decided otherwise, the judiciary recognizes the condition of things with respect to another country which once existed, and is still subsisting because of no other recognition. Phillips v. Payne, 92 U. S. 130, 23 L. Ed. 649; The Ambrose Light (D. C.) 25 F. 412.

"Changes in the government or the internal polity of a state do not as a rule affect its position in international law. A monarchy may be transformed into a republic, or a republic into a monarchy; absolute principles may be substituted for constitutional, or the reverse; but, though the government changes, the nation remains, with rights and obligations unimpaired." Moore, Digest International Law, vol. 1, p. 249.

[14-17] The granting or refusal of recognition has nothing to do with the recognition of the state itself. If a foreign state refuses the recognition of a change in the form of government of an old state, this latter does not thereby lose its recognition as an international person. Oppenheim, International Law, p. 120; Moore, Digest of International Law, vol. 1, p. 298. The suit did not abate by the change in the form of government in Russia; the state is perpetual, and survives the form of its government. The Sapphire, supra. The recognized government may carry on the suit, at least until the new government becomes accredited here by recognition.

[18] The argument that the plaintiff in error may at some future time, if the Soviet régime is recognized by our government, be compelled to pay again what it is obliged to pay now, is fallacious. It is only the acts performed in its own territory that can be validated by the retroactive effect of recognition. Acts theretofore performed outside its own territory cannot be validated by recognition. The former are illustrated in Underhill v. Hernandez, 168 U. S. 250, 18 S. Ct. 83, 42 L. Ed. 456, where the acts in question were performed in Venezuela; Oetjen v. Central Leather Co., supra, and Ricaud v. American

21 F.(2d)—26

Metal Co., 246 U. S. 304, 38 S. Ct. 312, 62 L. Ed. 733, where there were acts of confiscation in Mexico; and the English case of Luther v. Sagor [1921] 3 K. B. 532, acts performed in Russia. The latter are illustrated by Kennett v. Chambers, supra; U. S. v. Trumbull (D. C.) 48 F. 99; Agency of Canadian Car Co. v. American Can Co., supra.

[19] Following these principles, we agree with the contention of the defendant in error that the state of Russia, as a plaintiff, may continue the prosecution through the agency vested in Mr. Ughet, and the plaintiff in error will be protected as against any possible future claims of a subsequent recognized government of Russia, if payment be made as directed in this judgment.

In this action a verdict was directed by the court for the defendant in error for damages and interest after the jury made answer to the questions propounded in action No. 2, and after the facts thus found were considered for guidance herein. This court has heretofore passed on the question of liability of the plaintiff in error (Lehigh Valley R. Co. v. Allied Machinery Co. [C. C. A.] 271 F. 900; Lehigh Valley R. Co. v. Lysaght [C. C. A.] 271 F. 906), and we there held that the proof, much of which is repeated here, required the question of negligence of the railroad company in the care of the property entrusted to it as carrier be submitted to the jury (Lehigh Valley R. Co. v. Allied Machinery Co., supra). At 271 F. 903, we said:

"The case was plainly one for the jury, and the trial court submitted to their consideration in a full and fair charge the question whether the defendant exercised due care, having in view the size and character of the terminal and the storage in the yard of cars loaded with explosives and the general apprehension of incendiarism from German sympathizers, the sufficiency of the fire equipment, as to the number of hydrants, amount of hose, proper number of watchmen, and whether its employees had seasonably discovered the fire, and had exercised proper care to extinguish it, or to reduce the extent of its effect, or whether, if it had not failed in one or more of these duties, the loss might have been prevented. If so, the damage was 'caused by' the railroad company within the meaning of the Carmack Amendment."

See, also, same ruling by New Jersey Court of Errors and Appeals, New Jersey Fidelity & Plate Glass Ins. Co. v. Lehigh Valley R. Co., 92 N. J. Law, 467, 105 A. 206, certiorari denied 249 U. S. 600, 39 S. Ct. 258, 63 L. Ed. 796.

[20] The railroad company now contends that the acts of Congress, the Interstate Commerce Commission regulations for the transportation of explosives (Federal Explosives Law, Criminal Code, §§ 233, 235 [Comp. St. §§ 10403, 10405; 18 USCA §§ 383, 385]), and the Carmack Amendment of the Interstate Commerce Act (Comp. St. § 8604a [49 USCA § .20].), constitute the sole measure of liability of common carriers as to explosives in their possession in interstate commerce, and it argues that the loss of such property may not be compensated for, unless it be shown to be due to a breach or disregard of some federal law or regulation of the Interstate. Commerce Commission, adopted under the authority conferred upon the commission by section 8563, Comp. Stat. 1913 (49 USCA § 1). But the Supreme Court has ruled otherwise. Cincinnati, New Orleans & Texas Pacific R. Co. v. Rankin, 241 U. S. 325, 36 S. Ct..555, 60 L. Ed. 1022, L. R. A. 1917A, 265; Adams Express Co. v. Croninger, 226 U. S. 491, 33 S. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257. In these cases it was clearly pointed out that the federal laws or the Commerce Act (Comp. St. § 8563 et seq. [49 USCA § 1 et seq.]) cannot change the common-law rule theretofore approved in respect to a carrier's liability for a loss occurring on its own line. The common-law principle imposes liability on the carrier and makes the carrier an insurer, and is justified in the principles announced in Chicago & Eastern Illinois R. Co. v. Collins Produce Co., 249 U. S. 186, 39 S. Ct. 189, 63 L. Ed. 552; Railroad Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627; Bank of Kentucky v. Express Co., 93 U. S. 174, 23 L. Ed. 872.

[21] There is undisputed testimony that this yard was 4,900 feet long and 600 feet wide. There were no locomotives in this yard for moving cars in the event of fire, and when the fire was discovered in one of its cars it was necessary to bring engines from a distance of 2½ miles. By the time these engines arrived the fire had spread, so that a number of the cars containing T N T, other explosives, and inflammables were on fire. This was in direct violation of the regulations of the Interstate Commerce Commission. Sections 1650 and 1906. The railroad company has not excused itself from its faults as carrier in failing to deliver. The claim that the catastrophe and loss may be excused as an act of God was presented to us before and rejected in Lehigh Valley R. Co. v. Allied Machinery Co., supra. Nor was the question one for the jury, in view of the proofs and its obligation as a carrier.

[22] Error is assigned to the court's granting an amendment to the complaint. The complaint originally contained seven causes of action. Of these the first three referred to the destruction of T. N. T. The first bases the right of recovery upon the common-law liability of a carrier; the second alleges negligence on the part of the carrier as the proximate cause of the loss; and the third places the loss on the failure of the carrier to transport and care for the T N T while in its possession in accordance with a statutory and Interstate Commerce Commission regulation. The motion was granted, without objection, to strike out the two causes of action, leaving the first, which rested responsibility upon the common-law liability of the defendant as carrier. The fourth and fifth causes of action related to the barbed wire shipment, and contained an allegation of negligence on the part of the carrier, and also allegations of the common-law liability of the carrier because of contractual relations. The fifth cause of action was stricken out without objection. The sixth cause of action is not here brought in question, but an amendment was permitted on the fourth and sixth causes of action over the objection of the defendant. This amendment struck out allegations of negligence on the part of the defendant in transporting, caring for, and protecting the barbed wire while in its care, custody, and control.

[23, 24] The defendant in error contends that the language struck out was redundant and inadvertent, in view of the fact that the fifth and seventh causes of action were intended to be based upon the negligence of the carrier, and it insists that the fourth and sixth causes of action, without the language struck out, contain averments necessary to charge the defendant as a common carrier. The argument of the plaintiff in error is that the omission of the language struck out changed the cause of action from one based upon negligence to one based upon the common-law liability of the carrier, and that at the time the motion to strike out was granted the right to sue on a common-law contract liability against the carrier was barred by the statute of limitations. But the amendment in effect eliminated the claim of negligence in the fourth and fifth causes of action, and rested liability on the carrier's failure to deliver the shipment after having received it. It did not change the cause of action. Failure to deliver rendered the carrier liable, without regard to negligence, under these circumstances. The defendant in error did not in any way change the theory of the cause of action, as

was the fact in the cases relied upon by the plaintiff in error. United States v. Dalcour, 203 U. S. 408, 27 S. Ct. 58, 51 L. Ed. 248; Union Pacific Railway v. Wyler, 158 U. S. 285, 15 S. Ct. 877, 39 L. Ed. 983. In each of these cases the pleading was sought to be changed, so as to impose liability on a statutory obligation rather than the common-law liability. An amendment that introduces no new or different cause of action, or sets up no different state of facts as the ground of action, is properly granted and presents no error. Seaboard Air Line Railway v. Renn, 241 U. S. 290, 36 S. Ct. 567, 60 L. Ed. 1006. It was sufficient for the purpose of the defendant in error to prove the ownership of the goods, and that they had been delivered to the carrier in good condition, and upon proof of the failure to deliver, in the absence of a loss shown to be due to an act of God, or one of the other exceptions of the carrier's liability, recovery may be had without proof of the carrier's negligence.

[25] Bills of lading given for 11 cars of T N T had thereon, by a rubber stamp, "Shipper's load and count, charges guaranteed, owner's risk." It is argued that the use of the words "owner's risk" makes a special contract, whereby the carrier is exempted from all liability except for its negligence. However, the record discloses that the T N T was loaded at Bardale, Wis., in carload lots, by the shipper, and sealed by it. The carrier had no knowledge of the contents or the amount of each car, except as it was disclosed by the bill of lading made out by the shipper. The carrier was liable to the shipper only for that disclosed on the bill of lading, regardless of the contents of the car. In order to relieve itself of this liability, the carrier required that the bill of lading be stamped to show that it was the shipper's load and count, and as such it was accepted at the owner's risk. The phrase "shipper's load and count" alone would mean nothing in relieving the carrier from liability, and therefore the words "owner's risk" were appropriate.

[26] Prior to the Act of August 29, 1916, 39 Stat. 541, the conclusiveness of the bill of lading as to contents and quantity made it necessary for the carrier, in order to protect itself, to require some specific exemption, and an indorsement such as is made here accomplished that result. The convenience of the shipper was accommodated by permitting the loading and counting at its factory, and avoided the necessity of a count at the station of the carrier where the carrier's agent might make the count and vouch for the bill of lad-

ing as issued. Nor does the use of the words "owner's risk" change the responsibility of the railroad company from that of a common carrier to that of a bailee for hire. As a special contract it imposed no consideration therefor, nor is it reasonable or fair. Texas & Pacific Railway Co. v. Reiss, 183 U. S. 621, 22 S. Ct. 253, 46 L. Ed. 358; Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 441, 9 S. Ct. 469, 32 L. Ed. 788. A mere agreement to transport goods furnishes no consideration for a stipulation for less than common-law liability. There must be some specific consideration, as reduced rates, the performance of a duty other than that of a common carrier. Cincinnati, etc., R. Co. v. Rankin, supra. Such an exemption at least, as to damages, was unlawful after the Act of March 4, 1915, 38 Stat. 1197 (Comp. St. § 8604a [49 USCA § 20]). By its terms any "limitation of liability or limitation of the amount of recovery" by any such limitation without respect to the means or forms in which it is sought to be made is unlawful and void. The bill of lading was issued here July 19, 1916. The court below properly ruled that the use of the phrase "owner's risk" applied to the shipper's load and count.

[27] Each of the two bills of lading covering the transportation of T N T describes the shipment of 4,000 cases of high explosives, followed by an itemized statement of the lot number and initials of the numbers of the car in which each lot had been loaded. This informed the railroad company in writing that these cars delivered to it for transportation had 500 cases of high explosives, and the placards recognized by the Interstate Commerce Commission, showing the contents to be explosives, were affixed to the outside of each car. This fully complied with section 7 of the bill of lading, requiring a full disclosure to the carrier of the nature, danger, and explosive qualities of these goods. There was nothing to submit to the jury as to the failure to give notice to the carrier of the contents of the cars, for all precautionary regulations were carried out with due care.

[28, 29] Error is assigned for failure to submit to the jury the question of whether or not the notice of arrival had been duly sent or given, and that the explosion occurred more than 48 hours after such notice. But there was no evidence to support the specific notice required by the bill of lading. Notice was mailed as to one car at 5:40 p. m. on July 27, and as to the remaining 15 cars of the shipment at 6:05 on July 28, and as to 8 cars a written notice was sent by messenger July

28 at 5 p. m. July 29 was a Saturday, and the loss occurred on the night of July 29–30. Section 1 of the bill of lading excludes legal holidays. In computing the 48 hours, Saturday afternoon by practice should be regarded as a holiday. The court below so held, stating that Saturday for business purpose is an actual holiday within the meaning of the bill of lading. The purpose of the provision of the bill of lading is to give the consignee two full working days in which to take delivery. Louisville v. Savings Bank, 104 U. S. 469, 26 L. Ed. 775; Tweedie Trading Co. v. Pitch Pine Co. (D. C.) 156 F. 88.

[30] It is argued that a claim was not filed at the point of delivery, or at the point of origin, or within four months after delivery or time for delivery had elapsed. On September 11, 1916, the railroad company's agent for New York Harbor, on its letter head, wrote the agent of defendant in error advising him of the disastrous fire and explosion and giving a list of the cars for which recovery is sought here, as having been destroyed. In that letter he advised the defendant in error to file its claim with the freight claim agent of the plaintiff in error at Philadelphia, giving the name and address. Another letter was written by the same agent, addressed to the representative of the defendant in error, with respect to the wire and steel which also had been lost. The claim was subsequently filed, in accordance with the instructions in these letters, with the Philadelphia freight claim agent. It is now argued that, pursuant to the bill of lading, it was required to file the claim at the point of delivery or at the point at which the shipment originated. These letters estop the railroad company, because they misled the consignee. Georgia, Florida & Alabama R. Co. v. Blish Milling Co., 241 U. S. 190, 36 S. Ct. 541, 60 L. Ed. 948. The carrier having reported the loss to the consignee, and instructed the filing of the claim with the Philadelphia general freight claim agent, the requirements of the terms of the bill of lading were fulfilled. The carrier had knowledge of the loss, and was advised by the owner that it asserted a claim for the loss within the prescribed four months' period of the bill of lading.

The court below ruled that the Johnson Lighterage Company, which conveyed the explosives to the terminal of the plaintiff in error, was an independent contractor, and that, if the defendant in error employed it to do the lightering of these goods, it was not responsible for its acts or omissions. However, the plaintiff in error argues that it may escape responsibility because of the incompetency of the Johnson Company to do the work; second, that it was negligent in loading T N T and detonators on the Johnson No. 17, and that such loading was authorized and approved by the defendant in error; third, that it had failed to obtain a permit in compliance with the Jersey City ordinance for the storage and transportation of explosives, and that therefore the contract with the defendant in error was unlawful, and it is argued that, since the Johnson Company was acting as agent for the defendant in error, it is responsible for the acts of this independent contractor; and, fourth, that loading the T N T and detonators on the same barge constituted a common nuisance, for which the defendant in error was responsible.

[31, 32] As to the first of these, it is shown without contradiction that the Johnson Lighterage Company had performed this class of service for years, employing experienced men in handling explosives, and in no way is evidence offered to show that they were incompetent for the work they undertook. Competent stevedores were employed to do the loading and unloading. The detonators were made by the General Electric Company under a contract which provided for delivery alongside ship. They were being transported by the Johnson Company to a Russian ship lying in the harbor, not by reason of a contract between the Russian government and it, but under a separate contract between the General Electric Company and the Lighterage Company. The court below properly ruled that the Johnson Lighterage Company was an independent contractor, and, even if negligent or guilty of a nuisance, the defendant in error was not responsible for such acts. The failure to obtain the license required by the Jersey City ordinance was not a fault of the defendant in error, and is not a defense to an action by it. St. Paul Water Co. v. Ware, 16 Wall. 566, 21 L. Ed. 485; Acties-selskabet Ingrid v. Central R. Co. of New Jersey (C. C. A.) 216 F. 72, L. R. A. 1916B, 716; Smith v. New York Central, 164 N. Y. 491, 58 N. E. 655.

[33–35] A detective agency, employed by the fiscal agent of the defendant in error, had on the premises on the night of the fire men actively engaged in watching the property of the defendant in error, as well as that of other governments whose ammunition was also in cars at the railroad terminal. It is now urged that these detectives were negligent or at fault in failing to discover the fire, and in not in some way putting it out, and that is

chargeable against the defendant in error. There is no evidence that the defendant in error authorized the employment of these detectives, or that they were under the instruction or direction of the defendant in error, as held below. The railroad company was liable as a common carrier, unless it is made to appear that defendant in error in some way contributed to the causation of the injury. No obligation, contractual or otherwise, rested upon defendant in error to watch its property while in the possession of the plaintiff in error. No doctrine of contributory negligence is applicable to the facts here. There was no issue for the jury. The carrier's obligation was not asserted or based upon negligence. The burden was upon the carrier to prove that the loss or damage arose solely from one or more of the excepted causes, and it is of no avail to it to show that the shipper was in any way negligent, if the loss or damage would not have occurred, except for the concurring fault of the carrier. Railroad Co. v. Collins, supra; American Railway Express Co. v. Ewing (C. C. A.) 292 F. 335; Northwestern Marble Co. v. Williams, 128 Minn. 514, 151 N. W. 419, L. R. A. 1915D, 1077.

It is now contended that, if there was error in the finding in action No. 2, where the jury found plaintiff in error guilty of negligence, such finding should be set aside, and, if set aside, there is no legal basis for the judgment in action No. 1, and that therefore this judgment must be set aside.

[36] During the latter part of the trial of action No. 1 the plaintiff in error asserted a counterclaim against the defendant in error. The basis of this was that the Johnson Company was negligent in loading detonators and T N T on the same barge, and that this could be imputed to the defendant in error by proof of a custom on Johnson's part, or actual knowledge of the defendant in error of the fact of so loading the barge. The parties stipulated that the testimony on the subject in the second action, as well as the findings of the jury in that case, might be considered as having been taken and made in this action No. 1. On the trial of action No. 2, records were received and evidence adduced as to the acts of the Johnson Company for the consideration of that jury. It found the plaintiff in error negligent, and that its negligence was the sole proximate cause of the destruction of the aluminum stored in a warehouse on the night of the fire. It found for the railroad company on the other issues of the destruction of other property there involved.

The court ruled that the plaintiff in error was not responsible for bringing the T N T and detonators together on the barge, and that if there be fault in so doing it was the responsibility of an independent contractor, the Johnson Company. The question of the negligence of the railroad company was not material in action No. 1, and, if any error has been committed in action No. 2 as to charging or refusing to charge the jury on the question of negligence, it is immaterial, in so far as the questions involved in action No. 1 are concerned. We defer consideration of the questions of alleged errors committed in the course of that trial for the opinion in that action.

But it is urged that it was error, under the terms of the stipulation, to transfer the special findings of the jury in action No. 2 into action No. 1, and in directing a verdict for the defendant in error in action No. 1. Two questions submitted to the jury in action No. 2 were: First, did the fire originate on the land of the plaintiff in error or on Johnson barge No. 17? Second, did the first explosion occur on the land of the plaintiff in error, or on barge Johnson No. 17? The jury having answered the questions that the first explosion occurred on the barge, but the fire first on the railroad company's land, these other questions were addressed to it: First, was the defendant in error guilty of creating a nuisance in connection with the Johnson No. 17 being at that place with detonators and T N T on the same barge? And, second, was the defendant in error guilty of negligence, contributing to the damage, because of that situation? Thereafter the court directed the jury to find in the negative, and left to the jury in that case the sole additional question: Was this plaintiff in error guilty of negligence, as charged, either as the proximate cause or one of the contributing proximate causes of the damage done to the aluminum which is covered by the sixth, seventh, and eighth counts? The jury found that the plaintiff in error was guilty of negligence, as charged, as the sole proximate cause of the damage done to the aluminum in the warehouse.

The court having properly instructed the jury to answer in the negative the questions asked as to the negligence of the defendant in error in reference to the loading of the detonators and T N T on the same barge, the findings of the jury and rulings in the second action on the rejection or admission of evidence were equally immaterial to the issues in action No. 1, and in no way can they affect the result reached there. In any event, the

jury, in action No. 2, found as a fact that the negligence alone of the plaintiff in error resulted in burning the warehouse where the aluminum was stored, and, upon the theory of negligence, the question there was one for the jury. Liability was not asserted on the carrier's common-law liability as insurer. The phrase of the stipulation fully justified the construction placed thereon by the court below.

[37] It is now further argued that, because the court permitted the plaintiff in error to plead an equitable set-off, since a recovery was had on the carrier's liability, it should have been permitted to have submitted to the jury the question of negligence of the defendant in error in this action No. 1. But the only alleged act of negligence upon which the counterclaim rested was that of the Johnson Company, which, as we have pointed out, is not an act for which this defendant in error may be held responsible. Therefore the court properly instructed the jury in this action to find for the defendant in error on the counterclaim.

[38] Interest was allowed on the verdict of the jury from the date on which the loss occurred to the day the judgment was entered, July 2, 1925. It is now argued that this was erroneous. Interest is allowable from the time the property should have been delivered in imposing damages upon a carrier for breach of its common-law obligation, Miller v. Robertson, 266 U. S. 251, 45 S. Ct. 73, 69 L. Ed. 265; New York, Lake Erie & Western R. Co. v. Estill, 147 U. S. 591, 13 S. Ct. 444, 37 L. Ed. 292; The Elvaston (C. C. A.) 279 F. 935. It is allowed as compensation for the delay in paying the amount of the loss caused. Under the Carmack Amendment, the carrier's liability is for "full, actual loss, damage, or injury to the property." See Seaboard Air Line R. Co. v. United States, 261 U. S. 299, 43 S. Ct. 354, 67 L. Ed. 664; United States v. Rogers, 255 U. S. 163, 41 S. Ct. 281, 65 L. Ed. 566.

Seven hundred and four assignments of errors have been presented on this writ. We have not considered them all, for it would unduly prolong this opinion. Those we have considered are all we deem necessary to refer to. The brief submitted on behalf of the plaintiff in error contains some 1,050 pages, and in the accompanying case, action No. 2, which was argued at the same time, 300 pages. The records contain 6,766 pages. As was to be expected, such a volume of briefs contains constant repetitions of counsel's arguments, and serves no useful purpose, but

visits upon a busy court an unnecessarily laborious task. Much of what is written is not germane to the questions, and made the review more burdensome. However, all must be read with patience and labor. It is hoped that such an imposition will not be repeated by other counsel in any cause before this court.

Judgment affirmed, with costs.

For concurring opinion, see following case, 21 F.(2d) 409.