# Recommendation that the Department of Justice not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984

Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984 that retroactively extend the appointments of bankruptcy judges who were in office at the time of the expiration of the transition provisions of the Bankruptcy Reform Act of 1978, as amended, violate the Appointments Clause of the United States Constitution.

The Justice Department should not defend the constitutionality of the reinstatements under the Bankruptcy Amendments and Federal Judgeship Act of 1984, because its general obligation to defend the constitutionality of laws enacted by Congress does not extend to defending laws that unconstitutionally infringe upon the powers of the President.

August 27, 1984

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum supplements our previous memoranda of June 29, 1984 (to Assistant Attorney General McConnell, from Acting Assistant Attorney General Tarr) and July 6, 1984 (to Deputy Attorney General Dinkins, from Acting Assistant Attorney General Tarr) concerning the Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 Act). As we indicated in our previous memoranda, and as we set forth in greater detail below, we believe that the provisions (Grandfather Provisions) of the 1984 Act that purport to reinstate all bankruptcy judges who were in office at the time of the expiration on June 27, 1984 of the transition provisions of the Bankruptcy Reform Act of 1978, as amended (1978 Act), are constitutionally defective. We further believe that the constitutional defects are sufficiently serious and would have such a significant impact on the appointment (and, potentially, the removal) power of the Executive that the Department should refrain from defending their constitutionality. The Department, however, should be prepared to defend the other provisions of the 1984 Act if they are challenged in court. We specifically recommend that the Department set forth its position regarding the Grandfather Provisions in the case of In re Benny, Civ. No. 84120 MISC RHS BKY (N.D. Cal.), as generally articulated in a draft brief prepared by the Civil Division and transmitted to this Office on August 23, 1984.[1]

---

[1] NOTE: After this opinion was issued by the Office of Legal Counsel, the United States Court of Appeals for the Ninth Circuit refused to hold the reinstatement of bankruptcy judges unconstitutional. See In re Benny, 812 F.2d 1133 (9th Cir. 1987). The Court of Appeals did not address the issue considered by the Office of Legal Counsel — whether Congress may retroactively extend Presidential appointments under the Grandfather Provisions of the 1984 Act — because it construed the transition provisions of the 1978 Act as prospective extensions of the appointments. The Court of Appeals held that the prospective extension of the appointments was constitutional.

Under § 205 of Public Law No. 98–166, which continues the authorities contained in § 21 of Public Law No. 96–132, 93 Stat. 1049–50, the Attorney General is required to "transmit a report to each House of the Congress" in any case in which he determines that the Department of Justice "will refrain from defending . . . any provision of law enacted by the Congress in any proceeding before any court of the United States, or in any administrative or other proceeding, because of the position of the Department of Justice that such provision of law is not constitutional." Thus, if you concur that the Department should not defend the constitutionality of the Grandfather Provisions and should, as we recommend, participate in the *Benny* litigation consistent with our views and those of the Civil Division, Congress must be notified of that decision. If you concur, we will, with the participation of the Civil Division, draft a proposed letter to Congress. We have set forth below the reasons why we believe the Department should affirmatively contest, rather than defend, the constitutionality of the Grandfather Provisions.

I.

The 1978 Act was a comprehensive revision of the bankruptcy laws in which Congress made significant changes to both the substantive and procedural law of bankruptcy. *See generally* Pub. L. No. 95–598, 92 Stat. 2549 (1978). The procedural changes included modifications to the jurisdiction and the method of appointment of bankruptcy judges (previously referees in bankruptcy) to preside over bankruptcy proceedings. Section 201(a) of the 1978 Act provided for Presidential appointment of bankruptcy judges, who were to serve for a term of 14 years. *See* 92 Stat. at 2657. These judges were made subject to removal by the judicial council on account of "incompetency, misconduct, neglect of duty, or physical or mental disability." *Id.* Because of their removability and the fixed term of their appointments, it was clear that these bankruptcy judges were not intended by Congress to be judges in the sense envisioned by Article III of the Constitution.

The 1978 Act provided for a transition period before the new appointment procedures would take full effect on April 1, 1984. *See* 92 Stat. at 2682–88. The transition provisions provided that the previously existing bankruptcy courts would continue in existence and that incumbent bankruptcy referees (who had been and would continue to be during this transition period appointed by the district courts to serve 6 year terms) would continue after the expiration of their terms with no fresh appointment to be bankruptcy judges until the expiration of the transition provisions. A bankruptcy referee would not be continued only if the chief judge of the circuit court, after consultation with a merit screening committee, found the referee to be not qualified.

The 1978 Act granted broad jurisdiction to bankruptcy courts over bankruptcy and related matters. Although the Act initially vested this jurisdiction in the district courts, the bankruptcy courts (and the bankruptcy judges) were empowered to exercise all of the jurisdiction conferred upon the district courts

with respect to bankruptcy matters. *See* 92 Stat. at 2668. This jurisdiction included not only civil proceedings arising under the Bankruptcy Act, but also a wide variety of cases that might affect the property of an estate once a bankruptcy petition had been filed. Thus, included within the bankruptcy courts' jurisdiction were various types of contract actions, including claims based on state law.

The constitutionality of this broad grant of jurisdiction to the bankruptcy judges was challenged in a case that was decided by the Supreme Court as *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50 (1982). In *Northern Pipeline*, the Court declared that the broad grant of jurisdiction to bankruptcy courts, at least insofar as it included contract actions arising under state law, was inconsistent with the requirements of the Constitution that such actions, if heard in federal court, must be heard by judges with the protections and independence provided by Article III. The Court did not, however, apply its decision retroactively. In fact, the Court stayed the effect of its decision for three months in order to give Congress a chance to reconstitute the bankruptcy court system. The Court subsequently extended the stay, at the Solicitor General's request, for an additional three months until December 24, 1982, 459 U.S. 813, but it denied the Solicitor General's request for a further extension thereafter. 459 U.S. 1094 (1982).

Although Congress failed to act by the deadline imposed by the Court, the bankruptcy court system continued to operate through various ad hoc arrangements. Because the 1978 Act had initially granted jurisdiction of all bankruptcy proceedings to the district courts, the district courts resumed jurisdiction over all cases with respect to which bankruptcy court jurisdiction had been held unconstitutional under *Northern Pipeline*.

Thus, although the bankruptcy judges were disabled under *Northern Pipeline* from exercising the broad jurisdiction conferred by the 1978 Act, the district courts were able to utilize these courts for the resolution of certain bankruptcy matters under a temporary delegation of authority. The constitutionality of this interim arrangement was upheld by several courts of appeals. *See, e.g., In Re Kaiser*, 722 F.2d 1574 (2d Cir. 1983); *White Motor Corp.* v. *Citibank, N.A.*, 704 F.2d 254 (6th Cir. 1983); *In Re Hansen*, 702 F.2d 728 (8th Cir.), *cert. denied sub nom. First Nat'l Bank* v. *Hansen*, 463 U.S. 1208 (1983).

After *Northern Pipeline*, Congress labored for almost two years to adopt corrective legislation. Under the 1978 Act, the transition provisions were to expire at midnight on March 31, 1984. Congress passed four consecutive eleventh hour extensions of the transition provisions in order to delay the demise of the bankruptcy courts and the terms of the bankruptcy judges. Each such extension was passed by Congress and signed into law by the President before the expiration of the prior period. Ultimately, however, both the courts and the appointments expired on June 27, 1984, without Congress' passing either a new bankruptcy act or another temporary extension.[2] The 1984 Act was

---

[2] The original transition provisions provided that the term of a bankruptcy judge serving as a referee in bankruptcy when the 1978 Act was enacted would expire "on March 31, 1984 or *when his successor takes*
Continued

185

not passed by both Houses of Congress until June 29; it was not presented to the President until July 6, 1984; and it was not signed by the President until July 10, 1984. Thus, at the time the transition provisions expired, there were no bankruptcy courts and no bankruptcy judges. When the transition provisions expired, the Administrative Office of the U.S. Courts implemented a system under which the district courts handled bankruptcy matters with the assistance of the former bankruptcy judges, who performed their duties either as magistrates or consultants.

The 1984 Act, however, purported to continue in the new offices created by that Act the judges whose positions and terms had gone out of existence on June 27, 1984. Section 121(e) states that the term of any bankruptcy judge who was serving on that date is extended to the day of enactment of the 1984 Act (July 10, 1984). Section 106 purports to extend the retroactive appointments so that they will expire on the date "four years after the date such bankruptcy judge was last appointed to such office or on October 1, 1986, whichever is later."

Although the President decided to sign the bankruptcy bill, he included the following language in his signing statement:

> I sign this bill with the following additional reservations. I have been informed by the Department of Justice that the provisions in the bill seeking to continue in office all existing bankruptcy judges are inconsistent with the Appointments Clause of the Constitution. I am also advised that Administrative Office of the U.S. Courts has reached the same conclusion. Therefore, I sign this bill after having received assurances from the Administrative Office that bankruptcy cases may be handled in the courts without reliance on those invalid provisions. At the same time, however, I urge Congress immediately to repeal the unconstitutional provisions in order to eliminate any confusion that might remain with respect to the operation of the new bankruptcy system.

On July 27, 1984, the Director of the Administrative Office of the United States Courts issued a memorandum to all courts of appeals, district courts, and former bankruptcy judges in which he stated that the 1984 Act "may not be constitutionally valid." Because of the "inherent risk of the invalidation of judicial actions taken by bankruptcy judges," the Director concluded:

> I have therefore decided, upon advice of my General Counsel, and in accordance with my responsibilities under section 604 of

---

[2] (. . . continued)
*office.*" Pub. L. No. 95–598, § 404(b), 92 Stat. 2549, 2683 (1982) (emphasis added). Thus, it is arguable that under these original provisions the appointments of the "transition" bankruptcy judges would have continued on even after the expiration of the transition provisions. All four of the extension acts, however, contained specific provisions that declared that the term of office of the transition bankruptcy judges would expire at the conclusion of the extension period. *See, e.g.,* Pub. L. No. 98–249, § 2, 98 Stat. 116, 116 (1984). Thus we believe these actions by Congress made clear that the offices of bankruptcy judges expired at the end of the extension period.

title 28 of the United States Code, that I will not approve payment of salary to any former bankruptcy judge purporting to exercise judicial authority under the provisions contained in section 121.

Although the Administrative Office subsequently decided not to withhold the pay of the former bankruptcy judges, its position on the constitutionality of the provision has not been altered. It was the apparent intent of the Administrative Office that the bankruptcy system continue to operate with the prior bankruptcy judges' functioning in the manner of magistrates or consultants to assist the district courts until remedial legislation could be obtained when Congress returned from its recess, or until the courts of appeals could exercise their authority under the 1984 Act to appoint new bankruptcy judges to 14 year terms. The latter process, because of the appointment procedures imposed upon the courts, was expected to take at least two months.

## II.

It is beyond dispute that Congress could not constitutionally appoint bankruptcy judges. The Appointments Clause of the Constitution, art. II, § 2, cl. 2, provides that the President:

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

In *Buckley* v. *Valeo*, 424 U.S. 1 (1976), the Court held that "any appointee exercising significant authority pursuant to the laws of the United States" is an officer of the United States who must be appointed in accordance with the Appointments Clause. *Id.* at 126. The Court also explicitly held that neither Congress nor its officers may appoint officers of the United States. *Id.* at 127.

This prohibition is not altered by Congress' plenary power to establish "uniform laws on the subject of Bankruptcies throughout the United States" under Article 1, § 8 of the Constitution. Thus, the Court in *Buckley* held:

> The position that because Congress has been given explicit and plenary authority to regulate a field of activity, it must therefore have the power to appoint those who are to administer the regulatory statute is both novel and contrary to the language of the Appointments Clause. Unless their selection is elsewhere provided for, *all* Officers of the United States are to be appointed in accordance with the Clause.

187

*Id.* at 132. Likewise, the Court ruled that the Necessary and Proper Clause of the Constitution cannot authorize Congress to do what the Appointments Clause forbids. *Id.* at 134–35.

However, Congress did not purport in the Grandfather Provisions to make appointments, but rather only to extend the terms of persons previously appointed in accordance with the Constitution. Had Congress extended the terms before they expired on June 27, 1984, a different and more difficult issue would be presented. *See Myers* v. *United States,* 272 U.S. 52, 128–29 (1926) (Congress may prescribe duties, terms and compensation for public offices); *Shoemaker* v. *United States,* 147 U.S. 282 (1893) (Congress may add new duties that are germane to the functions already performed by a current officer of the United States). Thus, while a congressional extension of the term of an appointment could well raise constitutional questions, it would be qualitatively different than what Congress did in the 1984 Act. Here it is clear that both the terms of bankruptcy judges and their offices expired on June 27, 1984, two days before Congress enacted the Grandfather Provisions and nearly two weeks before the President signed them into law. Thus, the effect of Congress' action was to reinstate and recreate officers of the United States whose status as such had terminated, albeit only for a short period. The critical issue, therefore, is whether Congress may constitutionally achieve this result by purporting to extend retroactively the offices and terms of the bankruptcy judges who were sitting on June 27. While credible arguments can be made in favor of the validity of Congress' action, we conclude that this aspect of the 1984 Act violates the Appointments Clause.

The Supreme Court has recognized that the Appointments Clause is a direct limitation on Congress' power and essential to the operation of the separation of powers established by the Framers of the Constitution. *Buckley* v. *Valeo,* 424 U.S. at 118–19. Thus, the Court has held that the limitations imposed by the Appointments Clause must be strictly construed, stating:

> that Article II excludes the exercise of legislative power by Congress to provide for appointments and removals, except only as granted therein to Congress in the matter of inferior offices . . . and that the provisions of the second section of Article II, which blend action by the legislative branch, or by part of it, Senate advice and consent in the work of the executive, are limitations to be strictly construed and not to be extended by implication . . . .

*Myers* v. *United States,* 272 U.S. at 164.

The Court's decisions concerning efforts to reinstate former officers of the United States reflect this strict construction. In *Mimmack* v. *United States,* 97 U.S. 426 (1878), for example, the President accepted the resignation of an army captain on November 8, 1868, but attempted to revoke his acceptance about one month later, on December 11, 1868. The Court held that the attempted revocation was invalid, stating:

> Officers of this kind are nominated by the President and con-
> firmed by the Senate; and if the petitioner ceased to be such an
> officer when notified that his resignation had been accepted, it
> requires no argument to show that nothing could reinstate him in
> the office short of a new nomination and confirmation.

*Id.* at 437. It is noteworthy that in this context the attempted action would have constituted a Presidential evasion of legislative prerogatives. The 1984 Act reflects an attempted Legislative Branch encroachment into authority lodged in other Branches.

The Court considered an analogous situation in *United States* v. *Corson*, 114 U.S. 619 (1885). In that case, President Lincoln dismissed a military officer from the service on March 27, 1865. Shortly thereafter, on June 9, 1865, President Johnson revoked the order of dismissal and restored the officer to his former position. The Court found that as a result of President Lincoln's order, the officer "was disconnected from that branch of the public service as com-pletely as if he had never been an officer of the army." *Id.* at 621. Accordingly, the Court held that the Appointments Clause barred President Johnson from reinstating the officer save with the advice and consent of the Senate, stating:

> The death of the incumbent could not more certainly have made
> a vacancy than was created by President Lincoln's order of
> dismissal from the service. And such vacancy could only have
> been filled by a new and original appointment, to which, by
> the Constitution, the advice and consent of the Senate were
> necessary . . . .

*Id.* at 622. *See also Blake* v. *United States*, 103 U.S. 227, 237 (1880) ("Having ceased to be an officer in the army, he could not again become a post chaplain, except upon a new appointment, by and with the advice and consent of the Senate.").

These precedents teach that from the moment an incumbent loses his status as an officer of the United States, he cannot be restored to office save by a new appointment in accordance with the Appointments Clause. While these particu-lar cases protect the Senate's right under the Appointments Clause to consent to appointments, we see no principled basis for finding the President's appoint-ment power to be entitled to less protection in the context of an attempt by Congress to exercise that power. In fact, these cases show that the Court has been sensitive to erosion of the separation of powers principles at stake, which principles act neutrally to protect the process rather than any particular office holder.

Indeed, Congress by its actions has acknowledged that it lacks power to reappoint an officer of the United States. Thus, Congress has on occasion changed the retirement pay of military officers by retroactively changing their rank as of the date of their retirement, but has recognized that it cannot place an officer who was discharged from service on the retired list without first provid-ing for his reappointment:

189

> Congress has frequently exercised the power of changing the mere rank of officers without invoking the constitutional power of the Executive to appoint the incumbents to new offices. But when it has been the purpose to place on the retired list one who has been discharged from service, who no longer holds any office in the Army, Congress has provided for his restoration or reappointment in the manner pointed out by the Constitution, generally by the President alone, and then has authorized his retirement.

*Wood* v. *United States*, 15 Ct. Cl. 151, 161 (1879), *aff'd*, 107 U.S. 414 (1882). *See, e.g., Collins* v. *United States*, 14 Ct. Cl. 568, 15 Ct. Cl. 22 (1879).

A much more recent case, *United States* v. *Will*, 449 U.S. 200 (1980), also supports the conclusion that direct constitutional limitations on congressional power will be strictly enforced. In that case, the Court considered a statute repealing a scheduled cost of living salary increase for judges. One of the four separate measures under consideration in *Will* became law when signed by the President on October 1, 1976, hours after the increase took effect. Although no judge ever received the increased salary, and although the statute would have been constitutional if it had been signed by the President a few hours earlier, the Court held that the statute violated the Compensation Clause because it purported to repeal a salary increase technically already in force. 449 U.S. at 225. In reaching this result, the Court noted, ""'[w]henever it becomes important to the ends of justice, or in order to decide upon conflicting interests, the law will look into fractions of a day, as readily as into fractions of any other unit of time.'"" *Id.* at 225 n.29 (quoting *Louisville* v. *Savings Bank*, 104 U.S. 469, 474–75 (1881) (quoting *Grosvenor* v. *Magill*, 37 Ill. 239, 240 41 (1865))).

This principle that direct constitutional limitations on the powers of a Branch of Government, here Congress, must be strictly enforced distinguishes the cases in which the Court has upheld retroactive statutes. *E.g., Pension Benefit Guaranty Corp.* v. *R.A. Gray & Co.*, 467 U.S. 717 (1984); *United States* v. *Darusmont*, 449 U.S. 293 (1981). These cases concern the limits on retroactive economic legislation imposed by the Due Process Clause, not an explicit constitutional limitation on congressional power central to the separation of powers. We are not aware of any case in which the Court has allowed Congress to accomplish by indirection, through the guise of retroactive legislation, what it could not do directly under the Constitution.

While the conclusion that the moment an officer of the United States loses his status as such he cannot be reinstated except in accordance with the Appointments Clause is admittedly a technical one, it is no more technical than the *Will* Court's holding that a judicial salary increase is fully protected by the Compensation Clause the moment it takes effect. Moreover, the Court embraced precisely this construction of the Appointments Clause with respect to limitations on Presidential power in *Mimmack, Corson* and *Blake*. The Supreme Court has not hesitated to enforce structural provisions of the Constitution in their technical sense, undoubtedly because it is extremely difficult to locate a stopping

point once the initial erosion is permitted. Here, if a two-week hiatus were to be tolerated, where would the line be drawn? A great deal of uncertainty and litigation would undoubtedly follow. On the other hand, requiring Congress to act, if it wishes to do so, before legislation expires, is not unduly burdensome. Here, for example, Congress extended the terms of the bankruptcy judges four times before it finally failed to meet its own deadline.

One could argue against this reading of the Appointments Clause that the values protected by that provision are not implicated by Congress' action at issue here. In this regard, it is significant that the persons whose terms were extended were initially appointed in accordance with the Appointments Clause, and that Congress extended the terms of all sitting bankruptcy judges without attempting to evaluate the wisdom of retaining any particular individual. Moreover, Congress acted on an emergency basis in the face of perceived potential disruption of the bankruptcy system. However, the fact that the initial appointments were made in accordance with the Constitution does not distinguish *Mimmack*, *Corson* and *Blake*. Furthermore, an emergency cannot create powers not afforded a particular branch of Government under the Constitution. *Youngstown Sheet and Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952) (President's seizure of steel mills during Korean War held unconstitutional as violation of separation of powers).

For these reasons, we conclude that once the terms and offices of the bankruptcy judges expired on June 27, 1984, those officers could not be reinstated except by a new appointment made in accordance with the Appointments Clause. Congress could not evade this requirement through the fiction of retroactively extending the terms of the judges who were sitting on that date. While this conclusion may appear to some to be technical and restricts a convenient and efficient mechanism for dealing with an emergency, we believe that it is correct in light of the language and intent of the Constitution as interpreted by the Supreme Court. As the Court stated in *INS* v. *Chadha*, 462 U.S. 919 (1983):

> The choices we discern as having been made in the Constitutional Convention impose burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked. There is no support in the Constitution or decisions of this Court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided, either by the Congress or by the President.

*Id.* at 959.

## III.

The Supreme Court has consistently held that whether an unconstitutional provision may be severed from a statutory scheme is a matter of congressional

intent, and that the invalid portions of a statute should be severed "unless it is evident that the legislature would not have enacted those provisions that are within its power, independently of that which is not." *Champlin Refining Co.* v. *Corporation Comm'n*, 286 U.S. 210, 234 (1932). *See, e.g., Buckley* v. *Valeo*, 424 U.S. at 108. In reaffirming these principles in *INS* v. *Chadha*, the Court identified three basic principles with respect to severability. First, the Court reiterated the basic rule, stating:

> Only recently this Court reaffirmed that the invalid portions of a statute are to be severed "'unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.'" *Buckley* v. *Valeo*, 424 U.S. 1, 108 (1976), (quoting *Champlin Refining Co.* v. *Corporation Comm'n*, 286 U.S. 210, 234 (1932)).

462 U.S. at 931–32. Second, the Court stated that a severability clause is strong evidence that Congress did not intend for the entire statute to fall when one of its provisions is held to be unconstitutional. Accordingly, the presence of such a clause in the statutory scheme reinforces the presumption of severability. *Id.* Finally, the Court held that "a provision is further presumed severable if what remains after severance is 'fully operative as a law.' *Champlin Refining Co.* v. *Corporation Comm'n, supra*, 286 U.S. at 234." 462 U.S. at 934.

Applying these principles, we conclude that the Grandfather Provisions of the 1984 Act are severable. We have been unable to locate anything in the language of the 1984 Act or its legislative history tending to rebut the usual presumption of severability. To the contrary, § 119 provides:

> If any provision of this Act or the application thereof to any person or circumstance is held invalid, the remainder of this Act, or the application of that provision to persons or circumstances other than those as to which it is held invalid, is not affected thereby.

This severability clause is, as noted above, persuasive evidence of congressional intent.

Finally, the remaining provisions of the 1984 Act would be "fully operative as a law" in the absence of the Grandfather Provisions. Under § 104 of the 1984 Act, bankruptcy judges are to be appointed by the courts of appeals for the circuits in which the judgeships are located. The Grandfather Provisions are designed to facilitate the transition to appointments by the court of appeals by providing a temporary starting corps of judges. If the Grandfather Provisions are invalidated, the courts of appeals could appoint bankruptcy judges in accordance with the appointment scheme created by the 1984 Act. The courts of appeals would determine whether to reappoint some or all of the bankruptcy judges who were sitting on June 27, 1984. But whatever the courts' decisions in this regard, the bankruptcy court structure and the substantive provisions of bankruptcy law established by the 1984 Act would remain in place. Moreover,

because § 101 of the 1984 Act assigns plenary jurisdiction over bankruptcy matters to the federal district courts, they will be able to establish suitable arrangements for handling bankruptcy cases pending appointment of bankruptcy judges by the courts of appeals. Thus, the 1984 Act could operate fully without the Grandfather Provisions. For these reasons, we conclude that the Grandfather Provisions are severable.

## IV.

The President and his subordinates have a constitutionally imposed duty "to take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Attorneys General have generally construed this obligation to include the enforcement and the defense in court of laws enacted by Congress irrespective of questions that have been or might be raised regarding their constitutionality:

> [I]t is not within the province of the Attorney General to declare an Act of Congress unconstitutional at least, where it does not involve any conflict between the prerogatives of the legislative department and those of the executive department and that when an act like this, of general application, is passed it is the duty of the executive department to administer it until it is declared unconstitutional by the courts.

31 Op. Att'y Gen. 475, 476 (1919). *See also, e.g.*, 40 Op. Att'y Gen. 158 (1942); 39 Op. Att'y Gen. 11 (1937); 38 Op. Att'y Gen. 252 (1935); *id.* at 136 (1934); 36 Op. Att'y Gen. 21 (1929).

Like the courts, the Executive should (and does) apply a presumption in favor of the constitutionality of a federal statute. *E.g.*, *INS* v. *Chadha*, 462 U.S. 919, 944 (1983). Members of Congress take an oath to uphold the Constitution, and the Executive should presume that, in passing legislation, Members of Congress have acted with due regard for their responsibilities to the Constitution. *See Rostker* v. *Goldberg*, 453 U.S. 57, 64 (1981).

The Executive's duty faithfully to execute the law and recognition of the presumption of constitutionality generally accorded duly enacted statutes result in all but the rarest of situations in the Executive's enforcing and defending laws enacted by Congress. *United States* v. *Lee*, 106 U.S. 196, 220 (1882) ("No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.").

There are sound reasons of policy for this general practice. Our constitutional system is delicately balanced by the division of power among the three Branches of the Government. Although each Branch is not "hermetically" sealed from the others, *Buckley* v. *Valeo*, 424 U.S. at 121, and certain areas of overlapping responsibility may be identified, the quintessential functions of each Branch may be easily stated. It is axiomatic that the Legislature passes the laws, the Executive executes the laws, and the Judiciary interprets the laws. Any decision

by the Executive that a law is not constitutional and that it will not be enforced or defended tends on the one hand to undermine the function of the Legislature and, on the other, to usurp the function of the Judiciary. It is generally inconsistent with the Executive's duty, and contrary to the allocation of legislative power to Congress, for the Executive to take actions that have the practical effect of nullifying an Act of Congress. It is also generally for the courts, and not the Executive, finally to decide whether a law is constitutional. Any action of the President that precludes, or substitutes for, a judicial test and determination would at the very least appear to be inconsistent with the allocation of judicial power by the Constitution to the courts.

Exceptions to this general rule, however rare, do and must exist. These arise whenever the role of enforcing and defending a federal statute may not sufficiently discharge the Executive's constitutional duty. The President's veto power will usually be adequate to express and implement the President's judgement that an act of Congress is unconstitutional. By exercising his veto power, the President may fulfill his responsibility under the Constitution and also impose a check on the power of Congress to enact statutes that violate the Constitution. On some occasions, however, the exercise by the President of his veto power may not be feasible. For example, an unconstitutional provision may be a part of a larger and vitally necessary piece of legislation. The Supreme Court has held that the President's failure to veto a measure does not prevent him subsequently from challenging the Act in court, nor does Presidential approval of an enactment cure constitutional defects. *National League of Cities* v. *Usery*, 426 U.S. 833, 841 n.12 (1976); *Myers* v. *United States*, 272 U.S. 52 (1926).

Cases in which the Executive has chosen not to defend an Act of Congress may be placed in one of two categories. One category of cases involves statutes believed by the Executive to be so clearly unconstitutional as to be indefensible but which do not trench on separation of powers. Refusals to execute or defend statutes based upon a determination that they meet these criteria are exceedingly rare.[3]

---

[3] Our research has uncovered only three documented situations of this nature, although we cannot be sure there are not others, because informal (or even formal) decisions not to execute statutes would not necessarily be recorded in such a way as to make them accessible to us. And, if the Executive refused to enforce or defend the statute, the matter may never have come to the courts, or if it did, would have been unlikely to leave a prominent mark.

The first instance of refusal to defend such a statute that we have located occurred in 1962 in the context of a private civil rights action contesting the constitutionality of a federal law that provided federal funds for hospitals having "separate but equal facilities." In that case, *Simpkins* v. *Moses H. Cone Memorial Hospital,* 211 F. Supp. 628, 640 (M.D.N.C. 1962), *rev'd,* 323 F.2d 959 (4th Cir. 1963), *cert. denied,* 376 U.S. 938 (1964), the United States intervened and took the position that the statute in question, then 42 U.S.C. § 299e(f), was unconstitutional.

On October 11, 1979, former Attorney General Civiletti, over the strong objection of this Office, notified Congress by identical letters to the Speaker of the House and the President *pro tempore* of the Senate that the Department would not defend § 399(a) of the Public Broadcasting Act of 1967, 47 U.S.C. § 399(a). That decision was reversed by you in your letter to Chairman Thurmond and Senator Biden of the Senate Committee on the Judiciary of April 6, 1981. The Supreme Court subsequently struck down, by a narrow 5–

Continued

194

The other category involves statutes that the Executive believes are unconstitutional (although not necessarily so clearly unconstitutional as statutes falling in the first category) and that usurp executive authority and therefore weaken the President's constitutional role. The following statement of President Andrew Johnson's counsel in an early recorded statement addresses the President's responsibilities with respect to the second of these categories:

> If the law be upon its very face in flat contradiction of plain expressed provisions of the Constitution, as if a law should forbid the President to grant a pardon in any case, or if the law should declare that he should not be Commander-in-Chief, or if the law should declare that he should take no part in the making of a treaty, I say the President, without going to the Supreme Court of the United States, maintaining the integrity of his department, which for the time being is entrusted to him, is bound to execute no such legislation; and he is cowardly and untrue to the responsibility of his position if he should execute it.

2 *Trial of Andrew Johnson* 200 (Washington 1868). This statement, of course, was made in the context of the attempt to impeach President Johnson for, *inter alia*, having refused to obey the Tenure in Office Act, an act "which he believed with good reason . . . to be unconstitutional." 38 Op. Att'y Gen. 252, 255 (1935).

This early statement anticipated a practice that has subsequently been followed by the Executive under which the President need not blindly execute or defend laws enacted by Congress if such laws trench on his constitutional power and responsibility. Of course, under that practice the President is obligated to respect and follow the decisions of the courts as the ultimate arbiters of the Constitution.

This category of cases exists because, in addition to the duty of the President to uphold the Constitution in the context of the enforcement of Acts of Congress, the President also has a constitutional duty to protect the Presidency from encroachment by the other Branches. He takes an oath to "preserve, protect and defend" the Constitution. An obligation to take action to resist encroachments on his institutional authority by the Legislature may be implied from that oath, especially where he may determine it prudent to present his point of view in court. In this regard, we believe that the President must, in appropriate circumstances, resist measures which would impermissibly weaken the Presidency: "The hydraulic pressure inherent within each of the separate Branches to

---

[3] (. . . continued)
4 vote, that aspect of § 399(a) which had been viewed by this Office in 1979 as least susceptible to a credible defense, in contrast to the other provisions which we believed to be clearly defensible. *See FCC* v. *League of Women Voters of California,* 468 U.S. 364 (1984).

Finally, on January 13, 1981 former Attorney General Civiletti, with the concurrence of this Office, informed Congress by identical letters to the Speaker of the House and the President *pro tempore* of the Senate that the Department would not prosecute, under 18 U.S.C. § 1461 and 39 U.S.C. § 3001(e), the mailing of truthful, non-deceptive advertising regarding legal abortions.

exceed the outer limits of its power, even to accomplish desirable objectives, *must* be resisted." *INS* v. *Chadha*, 462 U.S. at 951 (emphasis added).

This duty to preserve the institution of the Presidency, captured above in the words of President Andrew Johnson's counsel, was articulated eloquently and somewhat more authoritatively by Chief Justice Chase, who presided over the trial in the Senate of President Johnson. Chief Justice Chase declared that the President had a duty to execute a statute passed by Congress which he believed to be unconstitutional "precisely as if he held it to be constitutional." However, he added, the President's duty changed in the case of a statute which

> directly attacks and impairs the executive power confided to him by [the Constitution]. In that case it appears to me to be the clear duty of the President to disregard the law, so far at least as it may be necessary to bring the question of its constitutionality before the judicial tribunals.
>
> \*          \*          \*
>
> How can the President fulfill his oath to preserve, protect, and defend the Constitution, if he has no *right* to *defend* it against an act of Congress, sincerely believed by him to have passed in violation of it?

R. Warden, *An Account of the Private Life and Public Services of Salmon Portland Chase* 685 (1874) (emphasis in original).[4] If the President does not resist intrusions by Congress into his sphere of power, Congress may not only successfully shift the balance of power in the particular case but may succeed in destroying the Presidential authority and effectiveness that would otherwise act as a check on Congress' exercise of power in other circumstances.

The major historical examples of refusal by the Executive to enforce or defend an Act of Congress have been precipitated by Congress' attempt to alter the distribution of constitutional power by arrogating to itself a power that the Constitution does not confer on Congress but, instead, reposes in the Executive. In such situations, a fundamental conflict arises between the two Branches, and this conflict has generally resulted in Attorneys General presenting to the courts the Executive's view of what the Constitution requires. The potential for such a conflict's arising was expressly recognized by Attorney General Palmer in 1919 when he issued the opinion, quoted above, that the general duty of the Attorney General to enforce a statute did not apply in the case of a conflict between the Executive and the Legislature. *See* 31 Op. Att'y Gen. 475, 476 (1919).

Seven years later, this caveat to the general rule was applied when the President acted contrary to a statute prohibiting the removal of a postmaster. That act led to litigation in which the Executive challenged, successfully, the

---

[4] Chief Justice Chase's comments were made in a letter written the day after the Senate had voted to exclude evidence that the entire cabinet had advised President Johnson that the Tenure of Office Act was unconstitutional. *Id. See* M. Benedict, *The Impeachment and Trial of Andrew Johnson* 154–55 (1973). Ultimately, the Senate did admit evidence that the President had desired to initiate a court test of the law. *Id.* at 156.

constitutionality of that statute in litigation brought by the removed postmaster. *Myers* v. *United States*, 272 U.S. 52 (1926). *Myers* appears to be the first case in which the Executive acted contrary to and then directly challenged the constitutionality of a federal statute in court:

> In the 136 years that have passed since the Constitution was adopted, there has come before this Court for the first time, so far as I am able to determine, a case in which the government, through the Department of Justice, questions the constitutionality of its own act.

*Id.* at 57 (summary of oral argument of counsel for appellant *Myers*).[5]

Almost a decade later, the Executive argued, unsuccessfully, that § 1 of the Federal Trade Commission Act would be unconstitutional if interpreted to prohibit the President's removal of a member of the Federal Trade Commission. *Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935). A similar argument was advanced, again unsuccessfully, by the Executive with respect to an analogous removal issue in the case of *Wiener* v. *United States*, 357 U.S. 349 (1958). Between these two cases, the Executive carried out, but then refused to defend when sued, and indeed successfully challenged the constitutionality of, a statute that directed that the salaries of certain federal employees not be paid. *United States* v. *Lovett*, 328 U.S. 303 (1946).[6] In 1976, the Appointments Clause was once again at issue when the Executive challenged, successfully, the appointment of members of the Federal Election Commission by officers of Congress. *Buckley* v. *Valeo*, 424 U.S. 1 (1976).

In addition to these examples, there have been and continue to be a number of cases involving the constitutionality of so called legislative veto devices in which the Executive has successfully challenged the constitutionality of legislative vetoes. Representative of this class of cases is, of course, *INS* v. *Chadha*, 462 U.S. 919 (1983). As is true of the other cases discussed above, the Court has never suggested that there has been any impropriety in the Executive's conduct.[7]

---

[5] It is perhaps noteworthy that this summary of the argument of appellant Myers' counsel goes on to record counsel's view that as to the appearance of the Department of Justice in opposition to the statute, "I have no criticism to offer; I think it is but proper." Further, that summary of the oral argument does not record any observations whatsoever on this point by Senator George Wharton Pepper, who appeared as counsel for the Senate and House of Representatives as *amicus curiae See* 272 U.S. at 65–77.

[6] The Supreme Court decided that the statute in question was unconstitutional as a bill of attainder, a constitutional defect not necessarily suggesting a clash between legislative and executive power. Because the statute was directed at subordinates of the President, however, the case took on that characteristic both as regards the bill of attainder issue and, more specifically, with respect to the argument advanced by the employees and joined in by the Solicitor General that the statute at issue constituted an unconstitutional attempt by Congress to exercise the power to remove Executive Branch employees See Brief for the United States at 10, 56, *United States* v. *Lovett*, 328 U.S. 303 (1946) (No. 809). Thus, *Lovett* falls squarely within the second category of cases as representing a clash between legislative and executive power.

[7] On July 30, 1980 Attorney General Civiletti transmitted to Chairman Baucus of the Subcommittee on Limitations of Contracted and Delegated Authority of the Senate Committee on the Judiciary a detailed explanation of this Department's policy with regard to defending federal statutes against constitutional challenges. It is perhaps noteworthy that in his letter to the Attorney General, as observed by the Attorney General in his response, Chairman Baucus had excluded from his broad inquiry "those situations where the
Continued

197

The general policy outlined above was rearticulated during this Administration in your letter of April 6, 1981, to Chairman Thurmond and Senator Biden of the Senate Committee on the Judiciary in response to their request that the Department reconsider its decision not to defend a provision of the Federal Communications Act being challenged in a case brought by the League of Women Voters in 1979. *See supra* note 2. That letter stated your view that the Executive "appropriately refuses to defend an Act of Congress only in the rare case when the statute either infringes on the constitutional power of the Executive or when prior precedent overwhelmingly indicates that the statute is invalid."

As indicated by our discussion of the merits of the constitutionality of §§ 106 and 121 of the Bankruptcy Amendments and Federal Judgeship Act of 1984 in part II above, the practical and legal effect of those provisions is to grant Congress the power to appoint officers of the United States. It is true that under the 1984 Act the power to make fresh appointments is vested in the courts rather than in the President or a head of a department. It is also true that bankruptcy referees whose terms were purportedly retroactively extended by the 1984 Act were themselves appointed by the district courts both prior to 1978 and under the transition provision of the 1978 Act. Thus, an argument could be made that the action of Congress in this situation does not infringe so directly on the power of the President as to place this particular enactment in the category of statutes thought to invade the prerogatives of the Executive. That argument is, however, untenable.

There can be no doubt that in the 1984 Act Congress could have placed the appointment power in the President, with or without the advice and consent of the Senate, the Heads of Departments, or the Courts pursuant to the Appointments Clause. If it were established that Congress could indeed make appointments in the manner they are made by the 1984 Act, there surely would be no principled basis upon which that power could be limited under the Appointments Clause to the appointment of officers whose appointments were generally assigned to the courts as opposed to the President or Heads of Departments. Thus, the principle of constitutional law involved squarely implicates the constitutional prerogatives of the Executive and warrants a challenge to the 1984 Act on this point by the Executive under the precedent discussed with respect to the second category of situations in which the Executive has historically refrained from defending the constitutionality of an Act of Congress. The inescapable fact is that if Congress may, as Congress would have it, retroactively extend the term of an officer of the United States whose term has expired, Congress presumptively could do so as regards any officer, thereby depriving

[7] (. . . continued

Acts themselves touch on constitutional separation of powers between Executive and Legislative Branches." Given the otherwise broad nature of Chairman Baucus' inquiry and the pendency of *Chadha* in the United States Court of Appeals for the Ninth Circuit, it would be reasonable to infer from his request an absence of concern as regards the Attorney General's challenge to the constitutionality of such devices

the President or his subordinates of the important control they exercise through the appointment process.[8]

We would add that this is not a case in which the Department's refusal to enforce or defend might produce a nullification of the Act of Congress which no private person could prevent nor Congress effectively challenge. Although it is not necessary to conclude that the obligation to defend the statute would be different in the absence of a lawsuit previously filed by private persons, given the fact that such a lawsuit has been filed, and that the courts will determine the constitutional issue, we believe that the constitutional system will be better served by early rather than delayed resolution of the issue.

Therefore, we believe that this is a case in which the Department, amply supported by prior precedent, should depart from its usual practice of defending the constitutionality of federal statutes. We recommend that an appropriate letter be sent to the President of the Senate and the Speaker of the House to inform them of the Department's decision to defend the constitutionality of the 1984 Act as a whole, but to refrain from defending the constitutionality of the Grandfather Provisions.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[8] Indeed, if Congress could retroactively extend the terms of officers whose terms have expired, Congress could arguably not only arrogate to itself, as it does here, the power to appoint, but could exercise that power even in the context of an office's having been filled in the interim by the President pursuant to his authority to make recess appointments; on such a hypothetical set of facts, Congress would not only have purported to appoint one officer but would, in doing so, have purported to remove another.